2024 IL App (3d) 220432

Opinion filed January 10, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0432 Circuit No. 21-CF-42 |
| STEVEN A. SHELLY, | ) ) ) | Honorable Howard C. Ryan Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Presiding Justice McDade and Justice Davenport concurred in the judgment and opinion.

**OPINION**

¶ 1       The defendant, Steven A. Shelly, appeals his convictions for aggravated discharge of a firearm, reckless discharge of a firearm, and unlawful possession of a firearm without a Firearm Owner's Identification (FOID) card, arguing (1) the State needed to show that he was aware his FOID card was revoked and (2) the evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated discharge of a firearm and reckless discharge of a firearm.

¶ 2                                     I. BACKGROUND

¶ 3       The defendant was charged with two counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)) and one count of unlawful possession of a firearm without a

FOID card (430 ILCS 65/2(a)(1) (West 2020)) based on an incident that occurred on February 5, 2021. The case proceeded to a jury trial on July 26, 2022.

¶ 4 The evidence at trial established that the defendant was employed by Ezariah Haydon for "about a year or so" as a contractor. The defendant was initially "a great worker," but after approximately six months the defendant began showing up late and "not necessarily in the right frame of mind to work for the day," and Haydon had to terminate his employment. After the defendant's employment was terminated, Haydon still owed him for between 10 and 14 hours of work. Haydon and the defendant communicated several times regarding the money via text messages and phone calls.

¶ 5 On February 3, 2021, the defendant text messaged Haydon to ask if they could meet up so he could collect the money. Haydon responded that he tried calling the defendant, then offered to send a check. The defendant then provided his address to Haydon.

¶ 6 On February 5, 2021, at 7:45 p.m., Haydon received a text message from the defendant stating that Haydon owed him for 17 hours of work. At that time, Haydon was at a bar with his friend, Chad Sibert. Haydon testified that the defendant then called him from an unrecognized number at approximately 8 or 8:15 p.m. The defendant sounded "disgruntled" and again demanded the money he was owed. During this phone call, the defendant stated that Haydon "had to pay him; otherwise, he was going to come to [Haydon's] house and take the money from [him]." Haydon told the defendant he would bring him the money because he did not want any more problems. On cross-examination, Haydon admitted that he did not provide records of this phone call to the police.

¶ 7 Together, Haydon and Sibert drove to the defendant's house. Haydon generally carried a firearm in a hip holster, but Haydon testified that he had unloaded it and stored it in the center console of his truck prior to entering the bar, and he was not carrying it when he and Sibert arrived

2

at the defendant's home. When they pulled into the driveway, they encountered the defendant's brother, and Haydon asked where the defendant was so he could pay him.

¶ 8    The defendant exited the house carrying a shotgun and "loudly screaming *** and pointing." The defendant approached Haydon and Sibert and got "right into [their] face[s]." Haydon pushed the barrel of the shotgun away from his face; then he and Sibert wrestled the shotgun away from the defendant. Sibert took the shotgun and handed it to the defendant's girlfriend, telling her to put it away. At that time, Haydon and the defendant were "rolling around on the ground in a scuffle." Sibert separated Haydon and the defendant by pulling Haydon away. The defendant then pulled a handgun from somewhere on his body and pointed it at them.

¶ 9    Upon seeing the gun, Haydon ran back to his truck, but Sibert stayed between Haydon and the defendant. The defendant began shooting at Haydon and Sibert. Over the course of one minute, the defendant intermittently fired four shots, one of which hit the windshield of Haydon's truck as he was entering it, spraying him with broken glass. Sibert felt one shot as it went past him, and another shot was fired as Sibert pushed the defendant's hand away. During this time, Sibert kept his hands out, telling the defendant to stop, and the defendant was screaming and yelling. Haydon called to Sibert to get in the truck so they could leave. Eventually, the defendant began to walk away, Sibert entered the truck, and he and Haydon began to drive away. As they were driving away, Haydon and Sibert both heard more gunshots.

¶ 10    Jody Macak testified that she and the defendant were in a relationship on February 5, 2021. Macak recalled the defendant expressing a desire to get paid by Haydon prior to the incident. On that date, she returned home from work at approximately 7:30 p.m. The defendant and his brother were in the metal pole barn next to the house, and she began preparing dinner. At some point, the

3

defendant entered the house briefly and left carrying a shotgun. The defendant seemed to be "in a rage," and Macak followed him outside, asking him what was going on.

¶ 11    When the defendant saw Haydon and Sibert, he walked toward them holding the shotgun and yelled that they needed to leave his property. A fight ensued, during which Sibert disarmed the defendant and then handed the shotgun to Macak. Macak and the defendant's brother fought over the shotgun, and he took it away from her. Macak walked quickly toward the defendant to try to break up the altercation. As Haydon and Sibert began to drive off, the defendant walked back onto the porch. Macak told the defendant he needed to calm down and attempted, unsuccessfully, to "de-escalate" the situation. While Haydon and Sibert were leaving, the defendant fired a handgun.

¶ 12    Several security cameras located on the defendant's property captured significant portions of the altercation. The videos were played for the jury. The parties also stipulated to the following additional evidence discovered upon searching the defendant's home: (1) three spent .380-caliber shell casings found in front of the metal pole barn and a fourth casing found in front of the residence in the driveway, (2) a fired bullet located in the driveway near the three shell casings, (3) a box containing .380-caliber ammunition located in the house, and (4) a "pink receipt" located in the house showing the transfer of ownership of a .380-caliber semiautomatic handgun to the defendant. No firearms were located during the search.

¶ 13    The State additionally admitted, without objection, a certified abstract issued by the Illinois State Police showing that the defendant's FOID card was revoked on December 14, 2020. After the State rested, the defendant moved for a directed finding, arguing that the State had failed to prove his guilt beyond a reasonable doubt because it had not proved that he was aware his FOID

4

card was revoked and because he had raised the affirmative defense of self-defense. The circuit court denied the motion.

¶ 14 The State then filed a motion *in limine* requesting that the defendant be barred from introducing "any evidence of [his] mistaken belief that his [FOID] Card was valid." At a hearing on the motion, the State argued that it was not required to prove the defendant knew his FOID card was revoked. The court granted the State's motion over the defendant's objection.

¶ 15 The defendant testified that he worked for Haydon in 2020 and 2021. After his employment was terminated, the defendant believed he was still owed between $150 and $200. On February 5, 2021, the defendant exchanged text messages with Haydon, but he denied ever making a phone call to Haydon or threatening to go to Haydon's house. When Haydon arrived at the defendant's house with Sibert, it was unexpected.

¶ 16 That evening, the defendant and his brother were working in the metal pole barn. The defendant's brother suggested shooting guns in the backyard, and the defendant retrieved his unloaded shotgun from the house. As he exited the house, the defendant saw Haydon and Sibert arriving, so he walked down the porch and told them that he "didn't know why they were there and they needed to leave." Haydon and Sibert were "towering over [him]" and "kind of being aggressive." The defendant tried to walk away when Haydon grabbed him and Sibert took the shotgun. Haydon pulled the defendant's jacket up over his head, which prevented the defendant from moving his arms. The defendant never pointed the shotgun at Haydon or Sibert and never tried to punch Haydon.

¶ 17 After standing up, the defendant pulled out a .380-caliber semiautomatic pistol, pointed it at Haydon and Sibert, and told them again that they needed to leave his house. The defendant began to walk away, and Haydon said, "Fuck you, I have a gun, as well." The defendant was aware

5

that Haydon carried a weapon, and he stored it either in the door of his truck or the center console of his van. When Haydon moved toward his truck, the defendant was afraid that Haydon would shoot him, and he fired a shot into his own car because he "wasn't trying to hit anybody ***. [He] just wanted them to leave." The defendant fired a second shot when he saw Haydon pull his pistol from the door of his truck. Afterward, he fired two more shots into the ground because he saw Haydon moving behind the truck.

¶ 18     The defendant denied firing a fifth shot as Haydon and Sibert were driving away. The defendant did not call the police afterward because he did not have cell phone service and he could not locate his phone. After the fight, the defendant's eye was swollen shut because Haydon dug his fingers into it and punched him several times on the side of the head. On cross-examination, the defendant admitted firing at least one shot in Sibert's direction but denied aiming at him. The last two shots were fired into the ground, and the first shot was aimed at his own car. The second shot, which hit Haydon's windshield, was aimed "to the left of [Sibert] and over into the ditch."

¶ 19     The jury found the defendant guilty of aggravated discharge of a firearm for firing at Haydon (count I), the lesser included offense of reckless discharge of a firearm for firing at Sibert (count II), and unlawful possession of a firearm without a FOID card (count III). The defendant filed a posttrial motion challenging the sufficiency of the evidence and arguing the State had failed to prove the defendant was aware his FOID card had been revoked. After denying the motion, the court sentenced the defendant to a term of four years' imprisonment on count I and concurrent two-year terms on counts II and III. The defendant appealed.

¶ 20                                    II. ANALYSIS

¶ 21     On appeal, the defendant contends that (1) convicting him of possessing a firearm without a FOID card under section 2(a)(1) of the Firearm Owners Identification Card Act (Act) (430 ILCS

65/2(a)(1) (West 2020)) required the State to prove that he knew his FOID card was revoked and (2) the evidence was insufficient to prove him guilty of aggravated discharge and reckless discharge of a firearm, considering the evidence of self-defense.

¶ 22                                A. Knowledge of FOID Card Status

¶ 23        The defendant first argues the State was required to prove that he knew his FOID card was revoked to secure a conviction under section 2(a)(1) of the Act. To determine which elements the State was required to prove, we must construe section 2(a)(1), and we conduct statutory analysis using *de novo* review. *People v. Messenger*, 2015 IL App (3d) 130581, ¶ 12. When construing a statute, our primary objective is to ascertain the intent of the legislature and give effect to that intent. *People v. Molnar*, 222 Ill. 2d 495, 518 (2006). The best evidence of the legislature's intent is the language of the statute itself, which must be given its plain and ordinary meaning. *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 181 (2007).

¶ 24        Statutes must be read as a whole, and we will not depart from the language of the statute by interjecting exceptions, limitations, or conditions tending to contravene the purpose of the enactment. *People v. Martinez*, 184 Ill. 2d 547, 550 (1998). However, we " 'will not hesitate to read into the sense of some section or provision a qualifying or expanding expression plainly implied by the general context of the act, which has been palpably omitted and which is necessary to prevent the legislative purpose from failing in one of its material aspects.' " *In re S.B.*, 2012 IL 112204, ¶ 28 (quoting *People ex rel. Barrett v. Anderson*, 398 Ill. 480, 485 (1947)).

¶ 25        Section 2(a)(1) prohibits any person from "acquir[ing] or possess[ing] any firearm, stun gun, or taser within this State without having in his or her possession a [FOID] Card previously issued in his or her name by the Department of State Police under the provisions of this Act." 430 ILCS 65/2(a)(1) (West 2020). The State admits the defendant was previously issued a FOID card

7

but contends that his previously issued FOID card was revoked at the time of the offense and that a revocation is sufficient to satisfy the requirements of section 2(a)(1). Whenever possible, we will read statutes as a whole and construe statutes in the light and context of other relevant statutory provisions. See *People v. Casler*, 2020 IL 125117, ¶ 24. Section 14 of the Act contains the following sentencing provisions:

"(a) Except as provided in subsection (a-5), a violation of paragraph (1) of subsection (a) of Section 2, when the person's [FOID] Card is expired but the person is not otherwise disqualified from renewing the card, is a Class A misdemeanor.

(a-5) A violation of paragraph (1) of subsection (a) of Section 2, when the person's [FOID] Card is expired but the person is not otherwise disqualified from owning, purchasing, or possessing firearms, is a petty offense if the card was expired for 6 months or less from the date of expiration.

(b) Except as provided in subsection (a) with respect to an expired card, a violation of paragraph (1) of subsection (a) of Section 2 is a Class A misdemeanor when the person does not possess a currently valid [FOID] Card, but is otherwise eligible under this Act. A second or subsequent violation is a Class 4 felony.

(c) A violation of paragraph (1) of subsection (a) of Section 2 is a Class 3 felony when:

(1) the person's [FOID] Card is revoked or subject to revocation under Section 8; or

(2) the person's [FOID] Card is expired and not otherwise eligible for renewal under this Act; or

8

(3) the person does not possess a currently valid [FOID] card, and the person is not otherwise eligible under this Act." 430 ILCS 65/14(a)-(c) (West 2020).

¶ 26    Section 14 therefore sets forth the penalties for section 2(a)(1) and describes separate penalties for offenders who have never been issued a FOID card and offenders whose FOID cards are expired, invalid, or revoked. Reading these two statutory provisions together, it is clear that, although the word "valid" does not appear in section 2(a)(1), the legislature intended to criminalize the possession of firearms while a person's FOID card was either expired, invalid, or revoked. We have previously held that the State may establish a violation of section 2(a)(1) by demonstrating that a defendant possessed a firearm while his FOID card was revoked. See *People v. Larson*, 2015 IL App (2d) 141154, ¶ 1.

¶ 27    The elements the State was required to prove were, therefore, that (1) the defendant possessed a firearm and (2) the defendant's FOID card was revoked. The question we must next address is what mental state the State was required to establish and whether that mental state applied to both elements of the offense or, as the State contends, merely the first.

¶ 28    On its face, the statute prescribes no mental state. However, the Criminal Code of 2012 (Code) provides that, when a statute neither prescribes a particular mental state nor creates an absolute liability offense, then either intent, knowledge, or recklessness applies. See 720 ILCS 5/4-3(b), 4-4, 4-5, 4-6 (West 2020). Absolute liability, wherein the State is not required to prove a culpable mental state, applies only if "the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described." *Id.* § 4-9. In all other instances, a mental-state requirement should be implied because, as a general rule, criminal acts require a culpable mental state. See, *e.g.*, *People v. O'Brien*, 197 Ill. 2d 88, 92 (2001). Indeed, "if at all

9

possible, the court will infer the existence of a culpable mental state, even where the statute itself appears to impose absolute liability." *Id.* The Act expresses no intent to create an absolute liability offense, and we do not find that the legislature intended section 2(a)(1) to be an absolute liability offense. See *People v. Sevilla*, 132 Ill. 2d 113, 122 (1989) (observing that the more severe an offense is, the less likely it is that the legislature intended to craft an absolute liability offense).

¶ 29    Because section 2(a)(1) criminalizes the possession of a prohibited item, it is a possessory offense. 430 ILCS 65/2(a)(1) (West 2020). Generally, knowledge is the appropriate mental state for possessory offenses (see *People v. Gean*, 143 Ill. 2d 281, 288-89 (1991)), and we find that knowledge is the correct *mens rea* to apply in this case. The State was therefore required to prove and, as the parties agree, did in fact prove that the defendant knowingly possessed a firearm. The question posed by this appeal is whether the *mens rea* requirement applies to both elements of the offense—in other words, whether the State was required to prove that the defendant knowingly possessed a firearm *and* knew that his FOID card was revoked.

¶ 30    As the parties discuss in their briefs, this question of statutory interpretation has not yet been before this court.[1] However, the Illinois Supreme Court recently addressed an analogous situation in *People v. Ramirez*, 2023 IL 128123.

¶ 31    In *Ramirez*, the Illinois Supreme Court analyzed section 24-5(b) of the Code, which prohibits the possession of defaced firearms. *Id.* ¶ 1; 720 ILCS 5/24-5(b) (West 2018). There are two facts the State must prove to establish a violation of section 24-5(b): (1) the defendant possessed a firearm, and (2) the firearm was defaced. *Ramirez*, 2023 IL 128123, ¶ 23. Previously,

---

[1] In addressing this issue, both parties relied on *People v. Fields*, 2022 IL App (4th) 210194, wherein the Fourth District addressed the issue. However, during the pendency of this appeal, *Fields* was vacated by our supreme court and remanded with instructions to reconsider its decision in light of *People v. Ramirez*, 2023 IL 128123.

courts had ruled that the State was required to prove the defendant's knowledge of the first fact but not the second. See, *e.g.*, *People v. Stanley*, 397 Ill. App. 3d 598, 608 (2009); *People v. Lee*, 2019 IL App (1st) 162563, ¶ 43.

¶ 32 *Ramirez* began by affirming that "knowledge" is the correct *mens rea* for possessory offenses. *Ramirez*, 2023 IL 128123, ¶ 22. The court then found that defacement is an essential element of the offense and the prescribed mental state (knowledge) applies to each element of the offense. *Id.* ¶ 23. The court observed that to hold otherwise would criminalize potentially innocent conduct due to circumstances of which the defendant was unaware. *Id.* ¶ 24. Further, the court noted that its construction of the statute was necessary to "avoid *** impermissibly burdening the federal constitutional right to keep and bear arms" because "[a] statute that criminalizes the knowing possession of a firearm, without more, would run afoul of the second amendment." *Id.* ¶ 26.

¶ 33 The supreme court's reasoning in *Ramirez* applies with equal force to the facts presented here. Section 24-5(b) is a possessory offense consisting of two elements: possession and defacement. Similarly, section 2(a)(1) consists of two elements: possession and the invalidity of the defendant's FOID card. Criminalizing the possession of a firearm without proving the defendant had knowledge his FOID card was invalid would penalize otherwise innocent conduct and would run afoul of the second amendment. See *id.* We therefore hold that the status of the defendant's FOID card is an element of the offense described by section 2(a)(1) of the Act and the *mens rea* requirement applies to both elements of the offense. The State was required to prove the defendant knew his FOID card was not valid at the time of the offense, and its failure to do so rendered the evidence insufficient to convict the defendant of that offense.

11

¶ 34    As in *Ramirez*, we believe the correct remedy is to vacate the defendant's conviction for unlawful possession of a firearm without a FOID card and remand the case to allow the State an opportunity to present evidence in accordance with this court's construction of the statute. See *id.* ¶ 31. The defendant should also be given the opportunity to present evidence that he did not know his FOID card was revoked. At the time of trial, *Ramirez* had not yet been decided. Double jeopardy does not preclude the retrial of a defendant whose conviction is reversed because of a posttrial change in the law. *Casler*, 2020 IL 125117, ¶ 57.

¶ 35    The defendant suggests that, if his conviction for unlawful possession of a firearm without a FOID card is reversed, we should reverse his convictions on counts I and II because the "entire trial was tainted with undue prejudice" when the defendant was "branded a criminal." We disagree. Even if the State had been required to prove the defendant's knowledge of his FOID card revocation at trial, the State would still have been permitted to argue, as it did in its opening and closing statements, that the defendant unlawfully possessed the firearms used in the commission of these offenses. We also find it unlikely that the status of the defendant's FOID card bore significantly on the question of whether the defendant fired at Haydon and Sibert or, if he did, whether he acted in self-defense. See *People v. Fornear*, 283 Ill. App. 3d 171, 180 (1996) (holding that it was not reversible error to jointly try an unlawful use of a weapon charge and an aggravated discharge of a firearm charge where there was no reasonable likelihood that the first charge would have been a material factor in resolving the second), *rev'd on other grounds*, 176 Ill. 2d 523 (1997). Accordingly, we next analyze whether the evidence was sufficient to convict the defendant of counts I and II.

¶ 36                              B. Sufficiency of the Evidence

12

¶ 37 The defendant contends that he was not proven guilty beyond a reasonable doubt of aggravated discharge of a firearm and reckless discharge of a firearm. We analyze whether the State presented sufficient evidence under the *Collins* standard, determining " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We draw all reasonable inferences from the evidence in favor of the prosecution, and we will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses. *People v. Martin*, 2011 IL 109102, ¶ 15.

¶ 38 A person commits aggravated discharge of a firearm when he or she knowingly or intentionally "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." 720 ILCS 5/24-1.2(a)(2) (West 2020). To prove aggravated discharge of a firearm, the State must prove that the defendant (1) knowingly discharged a firearm and (2) fired in the direction of another person. See *id.* A person commits reckless discharge of a firearm by discharging a firearm "in a reckless manner which endangers the bodily safety of an individual." *Id.* § 24-1.5(a). To prove reckless discharge of a firearm, the State is required to establish that the defendant (1) "discharg[ed] a firearm in a reckless manner" and (2) "endanger[ed] the bodily safety of an individual." See *id.*; *People v. Collins*, 214 Ill. 2d 206, 212 (2005).

¶ 39 Where, as here, the defendant is alleged to have fired at a person, reckless discharge of a firearm is a lesser included offense of aggravated discharge of a firearm, the operant difference being the mental state required to prove each offense. See *People v. Williams*, 293 Ill. App. 3d

13

276, 281 (1997) ("The act of discharging a pistol in the direction of an individual is a reckless act that would, if nothing else, endanger the safety of an individual.").

¶ 40   The defendant admitted to intentionally firing in Haydon and Sibert's direction at least once, although he denied aiming at them. The defendant's admission referred to the second shot he fired, which shattered the windshield of Haydon's truck. This admission, along with Haydon and Sibert's testimony, was sufficient to establish the elements of aggravated discharge of a firearm with respect to Haydon because the defendant knowingly discharged a firearm in the direction of another person.

¶ 41   Sibert's location between the defendant and Haydon required the defendant to attempt to shoot past Sibert to hit Haydon, and although the defendant claims he intentionally fired either toward the ground or at his own car, Haydon and Sibert's testimony contradicts the defendant's. The video makes clear that the defendant was not taking careful aim but was instead firing quickly and haphazardly in the direction of Sibert and Haydon. Taking the evidence in the light most favorable to the State, as we must, we find that the evidence presented at trial satisfied the elements of reckless discharge of a firearm with respect to Sibert.

¶ 42   At trial, the defendant raised the affirmative defense of self-defense, arguing that Haydon and Sibert were the aggressors because they arrived uninvited to his home and attacked him. In support of his argument, the defendant testified that the gun only contained four bullets, and there was no evidence apart from Macak's testimony that he fired a fifth shot as Haydon and Sibert were leaving. The defendant contends the jury must have relied on the fifth shot to overcome his affirmative defense.

¶ 43   "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in

14

addition to proving the elements of the charged offense." *People v. Dillard*, 319 Ill. App. 3d 102, 106 (2001). "The elements of self-defense are that (1) unlawful force was threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, and (4) the use of force was necessary." *Id.* "[A] jury has discretion to reject a self-defense claim based on the probability or improbability of defendant's account, the circumstances of the crime, the testimony of the witnesses, and witness credibility." *People v. Brown*, 406 Ill. App. 3d 1068, 1081 (2011). If the State negates any of the elements of a self-defense claim, the defense must fail. *People v. Shields*, 298 Ill. App. 3d 943, 947 (1998).

¶ 44   Haydon and Sibert's testimony, if believed, defeats all four elements of the defendant's self-defense claim, regardless of whether a fifth shot was fired. They testified that they did not initiate the conflict or threaten the defendant, they tried to retreat at the earliest available opportunity, and it was the defendant who was the initial aggressor. The videos introduced were consistent with their account of events. The case therefore hinged on the jury's interpretation of the evidence and its credibility determinations. As noted above, we are not permitted to disturb the jury's credibility findings (*Martin*, 2011 IL 109102, ¶ 15), and we find that the jury's decision to credit Haydon and Sibert's testimony is sufficient to defeat the defendant's self-defense claim. We therefore hold that there was sufficient evidence to convict the defendant of aggravated discharge of a firearm and reckless discharge of a firearm.

¶ 45   In coming to this conclusion, we reject the defendant's request to rely on the videos instead of the jury's interpretation of the evidence. In the video depicting the relevant time frame, the defendant was seen walking away from the altercation and toward his front door, entering the house, then shortly after exiting to stand outside. He held a pistol, and he gestured angrily with it several times toward Haydon's retreating vehicle. For several seconds, the defendant was

15

completely outside the frame of the video. Although there was no gunshot visible in the video, the shot could have been fired while the defendant was outside the video's frame. "On appeal, we will not substitute our judgment for that of a trier of fact in cases where the facts could lead to either of two inferences, unless the inference accepted by the fact finder is inherently impossible or unreasonable." *People v. Lemke*, 349 Ill. App. 3d 391, 398 (2004). We do not find the jury's interpretation of the facts "inherently impossible" or "unreasonable." See *id.*

¶ 46 In sum, the defendant's conviction for unlawful possession of a firearm without a FOID card is reversed and remanded for a new trial, and his remaining convictions are affirmed. We note that the conviction for unlawful possession of a firearm without a FOID card may have been a factor at the defendant's sentencing hearing, as it was the only nonprobationable offense. On remand, should the State decline to further prosecute the defendant for unlawful possession of a firearm without a FOID card, a new sentencing hearing will be required.

¶ 47 III. CONCLUSION

¶ 48 The judgment of the circuit court of La Salle County is affirmed in part, reversed in part, and remanded for further proceedings.

¶ 49 Affirmed in part and reversed in part.

¶ 50 Cause remanded.

## *People v. Shelly*, 2024 IL App (3d) 220432

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of La Salle County, No. 21-CF-42; the Hon. Howard C. Ryan Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Anthony R. Burch, of Burch & Associates, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Joseph Navarro, State's Attorney, of Ottawa (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |