2024 IL App (4th) 210194-B

NO. 4-21-0194

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 8, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| JAQUAY M. FIELDS, | ) | No. 19CF114 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court, with opinion.
Justice Harris concurred in the judgment and opinion.
Presiding Justice Cavanagh concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1        On November 9, 2020, a jury found defendant, Jaquay M. Fields, guilty of unlawful possession of a weapon with a revoked firearm owner's identification card (FOID card) (430 ILCS 65/2(a)(1) (West 2018)). On January 7, 2021, the trial court sentenced defendant to two years in prison with one year of mandatory supervised release (MSR). Defendant appealed and argued, in her original appellant brief, the court erred in denying her motion to suppress evidence found after an unlawful traffic stop, the State failed to prove she was reckless in not knowing her FOID card had been revoked, and alternatively, the court erred when it barred defendant from presenting evidence she was unaware of the revocation. This court affirmed defendant's conviction and sentence. *People v. Fields*, 2022 IL App (4th) 210194. Defendant filed a petition for leave to appeal with the Illinois Supreme Court.

¶ 2        On September 27, 2023, the Illinois Supreme Court denied defendant's petition for leave to appeal but issued a supervisory order (*People v. Fields*, No. 129126 (Ill. Sept. 27, 2023) (supervisory order)), directing this court to vacate our prior judgment and reconsider our decision in light of *People v. Ramirez*, 2023 IL 128123, on the issue of whether the State was required to prove a mental state pertaining to the revocation of defendant's FOID card and determine if a different result is warranted. The parties filed supplemental briefs on the matter and agree the trial court erred because a defendant's knowledge of the revocation of his or her FOID card is an element of the offense of unlawful possession of a weapon with a revoked FOID card. However, they disagree as to whether defendant's conviction should be reversed or vacated with the cause remanded for a new trial. We agree an error occurred and reverse defendant's conviction and sentence.

¶ 3                                I. BACKGROUND

¶ 4        On July 17, 2019, the State charged defendant by information with unlawful possession of a firearm without a valid FOID card citing section 2(a)(1) of the Firearm Owners Identification Card Act (Act) (430 ILCS 65/2(a)(1) (West 2018)). On August 1, 2019, a grand jury indicted defendant on the same charge.

¶ 5        On November 8, 2019, defendant filed a motion to suppress the evidence recovered after her motor vehicle was stopped on July 6, 2019. According to the motion, the police claimed she was stopped because of her defective exhaust system. After reportedly smelling cannabis, the police officer searched defendant's vehicle and found the firearm at issue. Defendant argued the vehicle was not excessively loud and the police officer used the exhaust offense as a pretense to stop defendant's vehicle.

¶ 6        On December 19, 2019, the trial court held a hearing on defendant's motion to

suppress. Defendant offered the following testimony. She was driving home from St. Louis on July 6, 2019, and was obeying the speed limit. Demetric Collum was a passenger in her vehicle. Both defendant and Collum are African American. When she first saw the police vehicle in the median of the interstate, she was in the lane furthest from the police officer and some other vehicles were about half of a mile in front of her on the interstate. The police officer began following her after she passed. The officer then switched lanes and drove up alongside her vehicle. She and the police officer looked at each other, and the officer then passed her. Shortly thereafter, defendant saw the officer again pulled over in front of an exit sign on the interstate. When she passed, the officer pulled her over.

¶ 7 The officer approached her vehicle on the passenger side and indicated he stopped defendant because of her vehicle's loud exhaust. The officer took both her and Collum's identification cards back to his police vehicle. When the officer came back to her car, he asked her about a restraining order she had against Collum. Defendant said the restraining order was never served on Collum. However, the officer indicated he could still arrest Collum. The officer then asked Collum to exit the vehicle and asked defendant if anyone had been smoking marijuana in the car. She said no. Defendant told the officer she thought he only pulled her over because he wanted to search her vehicle. The officer then ordered her to get out of the car. Defendant complied but said she did not consent to a search of her vehicle.

¶ 8 The police officer began searching her car anyway, then handcuffed Collum, and then resumed his search. The officer then came back and questioned defendant about a handgun he found. Defendant answered the deputy's questions regarding what kind of gun was in the vehicle, what caliber it was, and who the gun belonged to. She told the officer she had a concealed carry license (CCL) and FOID card in her wallet. The officer found those cards and told her they

were revoked. Defendant told the officer she did not know they were revoked. When the officer continued his search of the car, he found a piece of a blunt. Collum told the officer he had smoked in the car in St. Louis and the blunt was his.

¶ 9       The police officer confiscated defendant's handgun but eventually let her and Collum leave. Defendant indicated she never smelled marijuana in the car or noticed any excessive noise coming from the exhaust. After later receiving a notice of an arrest warrant, she turned herself into the authorities. Defendant stated she took her vehicle to Midas after the stop. Midas said no repairs were needed.

¶ 10      The State then called Woodford County Sheriff's Deputy Nathan Campbell, who testified he was watching northbound traffic in the median of Interstate 39 between 7:30 p.m. and 9 p.m. on July 6, 2019. Deputy Cole Mekley was with Deputy Campbell. When defendant's vehicle passed, he noticed the vehicle's excessive exhaust noise—which indicated a problem with the factory exhaust system—and defendant's "jubilant singing." Defendant was not speeding, and no other vehicles were in the immediate vicinity of defendant traveling north. Deputy Campbell wanted to develop the situation more based on what he observed, so he caught up with defendant's vehicle. He drove up to the side of the vehicle, confirmed the exhaust violation, and then monitored the vehicle's actions. The following exchange occurred between the prosecutor and Deputy Campbell regarding what was different about defendant's vehicle:

"A. It was loud. I typically don't hear a vehicle's exhaust even traveling on the highway.

Q. And could you—was this an unusual sound coming from this make and model of car?

A. Yes, sir.

- 4 -

Q. Have you had the experience with this, like Ford SUVs such as what you were pulling over?

A. Yes, sir.

Q. Okay. Was this exhaust system louder than other vehicles you have come into contact that are even 2008 Ford SUVs?

A. Yes, sir."

After passing defendant, he kept watching her in his rearview mirror. He slowed down to between 55 and 65 miles per hour to see if the vehicle would catch up to him. It did not.

¶ 11 After considering the circumstances, Deputy Campbell decided to stop defendant, so he pulled over and waited for her to pass. When defendant's vehicle passed, Deputy Campbell could still hear the loud exhaust, and he stopped defendant. Deputy Campbell and Deputy Mekley approached the passenger side of defendant's vehicle. Deputy Campbell asked defendant for her driver's license and insurance card and Collum for his name and date of birth. Deputy Campbell determined defendant had an order of protection against Collum and understood the order had been served on Collum. Deputy Campbell had Collum exit the vehicle. Deputy Campbell then spoke with defendant and smelled burnt cannabis in the vehicle. Defendant denied any marijuana had been smoked in the vehicle. Collum later admitted he had smoked marijuana in the vehicle a few hours earlier.

¶ 12 Deputy Campbell then searched the vehicle and found a small blunt, which smelled like cannabis, and a 9-millimeter pistol. Deputy Campbell immediately put handcuffs on Collum, who Deputy Campbell knew was on parole. Deputy Campbell then spoke with defendant about the pistol to determine who owned it and whether she knew it was in the vehicle. According to Deputy Campbell, defendant hesitated before saying a firearm might be in the vehicle. She then

described the firearm and said it was hers. Deputy Campbell then determined defendant's FOID card and CCL were revoked. Deputy Campbell seized the firearm but allowed defendant and Collum to leave the scene. He did not cite defendant for operating a vehicle with a loud exhaust nor write a warning citation. When asked why he pulled the vehicle over initially, Deputy Campbell testified, "The legal cause was for the exhaust violation."

¶ 13 On cross-examination, Deputy Campbell said defendant's vehicle was just cruising along, not accelerating, when he first saw it. He heard noise coming from the vehicle that was different than normal engine noise. He described what he heard as follows:

> "In the engine I—it's been a long-time hobby of mine, and that's even how I addressed it with her, is you could tell almost from the gurgling sound that—it sounded as a leak that would be close to the manifold as if the header or that manifold was leaking, or maybe the gasket had come loose from the motor there. It's a gurgling, loud noise that you get when it's that close to the motor."

Deputy Campbell said the noise would be present when the vehicle was cruising but would increase with acceleration. He did not have any kind of sound meter or other device to measure the decibel level of the vehicle. Deputy Campbell said he started following defendant's car because it "piqued" his interest based on the exhaust, the driver singing, and the vehicle's window being halfway down.

¶ 14 Deputy Campbell conceded the window being down was not notable in a legal sense. When asked why a person singing would draw his attention or be worth investigating, Deputy Campbell responded:

> "There's different things that I've noticed in my experience doing the job and as well that I've been trained to. Singing is one of those things. Oftentimes you

will see somebody stretching as they pass in front of me. The stretching, the yawning, the singing is all something done that they feel pressure on them because the police officer is sitting there knowing they're looking. And all of those things are done by that subject to make it look as if they're relaxed. I'm not concerned about you. I'm okay. I'm an innocent person traveling down the road. I'm just relaxing, singing. When, quite oppositely, I sing. I sing in a band. But when I stop at the red light in Peoria and I'm singing alone in my truck and I know that people are watching me I stop singing. Most people don't enjoy being watched singing. I watch thousands of cars a day going down the highway. Very rare for me to see somebody singing jubilantly."

¶ 15 Defense counsel argued the stop was unlawful because defendant's car was not excessively noisy. Deputy Campbell relied only on his own ears and did not use any kind of mechanical or sound test. Further, defendant had the vehicle's exhaust tested after the fact and no problems were detected. Counsel argued everything found after the illegal stop was the fruit of the unlawful stop. The State argued Deputy Campbell made a lawful stop based on the vehicle's loud exhaust.

¶ 16 The trial court stated the video evidence showed it was obvious defendant's vehicle had an exhaust problem. The court placed little weight on defendant's assertion about the Midas vehicle examination because the vehicle could have been repaired before it was taken to Midas. The court also indicated "the video is really clear there was an exhaust problem here. And you particularly hear it, overwhelmingly clearly hear it, when the defendant revs the engine. But that happens later."

¶ 17 The trial court indicated Deputy Campbell pulled out and started following

defendant based on a hunch but pulled up near the vehicle and heard the exhaust more clearly. Deputy Campbell then passed the vehicle and then slowed down to see if defendant would pass him, which she did not do. Deputy Campbell then pulled over. When defendant passed, Deputy Campbell pulled defendant over. The court found the officer had articulable suspicion because the officer could hear the exhaust. The court denied the motion to suppress, stating the "officer was doing what he was supposed to be doing. He didn't violate any constitutional rights that I've heard yet of the defendant's."

¶ 18        At defendant's trial, Deputy Campbell testified he noticed a leak in defendant's exhaust was "producing excessive noise" when it passed him. He testified the vehicle was louder than the other traffic around it. He pulled the vehicle over because of the loud exhaust. With regard to the reason for the stop, the State and Deputy Campbell had the following exchange:

"Q. Could you describe the sound that was coming from that vehicle that first drew your attention to it?

A. It's just that gurgling sound that usually you hear when the gasket is leaking up at the manifold of the engine, so the header or the exhaust manifold from the motor. Typically it makes a lot of noise if you have a hole in the muffler, or something. But once you get up close to the cylinder you almost hear, like, a gurgle with it. It's just—it's difficult to hear in the video from the speakers today. But if you're able to watch this, pretty doggone obvious. Probably on a sound level I would say somewhere around maybe a motorcycle level of noise.

Q. Okay. Louder than the normal car in your experience of doing traffic enforcement?

A. Absolutely."

¶ 19 During the stop, he found defendant had an order of protection against her passenger, Collum. He also smelled cannabis in the vehicle. After smelling the cannabis, he searched the vehicle and found a firearm. Defendant said the weapon was hers and described it for the officer. She also indicated she had a FOID card and a CCL. Deputy Campbell determined defendant's FOID card had been revoked. As a result, he confiscated her handgun.

¶ 20 Deputy Campbell did not arrest either defendant or Collum. He offered to give Collum a ride to a gas station so he could call and get a different ride home. Deputy Campbell warned Collum another officer could arrest him for being in violation of defendant's order of protection. Collum declined the offered ride and left with defendant. Deputy Campbell indicated he prepared a report regarding the encounter and sent it to the state's attorney.

¶ 21 Jon Achas, who worked for the Illinois State Police, testified he was in the investigative section of the Firearm Services Bureau. Achas testified defendant's FOID card was revoked as of April 21, 2019. On July 6, 2019, defendant did not have a valid FOID card or a CCL, which was revoked on April 24, 2019. Achas testified a notice of revocation is mailed to the holder of the FOID card when the card is revoked. Any notices for defendant would have been mailed to defendant at a Plano, Illinois, address.

¶ 22 The State rested after Achas testified. Based on a conversation the prosecutor previously had with defense counsel, the State then made an oral motion *in limine* asking the trial court to prohibit defendant from testifying she did not know her FOID card had been revoked. According to the State, the law did not require defendant to know of the revocation to be guilty of the offense. The court granted the motion *in limine*, concluding "knowledge of the revocation is not an element and is, therefore, not relevant. So whether she received notice, that is not an issue the jury is required to decide." However, the court also stated the following: "[I]n this instance[,]

I think they also have to prove that the FOID card was revoked, because that's an aggravating factor. So that will have to be an additional element submitted to the jury."

¶ 23 Defense counsel indicated defendant had planned to testify she was never notified either her FOID card or CCL had been revoked. However, because of the trial court's ruling on the State's motion *in limine*, defense counsel said defendant had no evidence to present. Defense counsel did not ask the court to allow defendant to testify outside the presence of the jury as part of an offer of proof.

¶ 24 The jury found defendant guilty.

¶ 25 At the January 7, 2021, sentencing hearing, defendant testified she did not know her FOID card and CCL had been revoked when she was stopped and would not have been carrying the firearm had she known of the revocation. The State indicated defendant was convicted of a nonprobationable offense with a sentencing range between two and five years in the Illinois Department of Corrections. See 730 ILCS 5/5-5-3(c)(2)(N) (West 2018). The State asked for a 40-month prison sentence. The trial court sentenced defendant to the statutory minimum, which was two years in prison. The court explained he would have given defendant probation or conditional discharge if he could.

¶ 26 Defendant filed neither a posttrial motion nor a motion to reconsider sentence. On January 21, 2021, more than 30 days after the jury found her guilty and after she was sentenced, defendant filed a motion to reconsider the ruling on the motion to suppress. On April 8, 2021, the trial court denied defendant's untimely motion to reconsider and appointed the Office of the State Appellate Defender (OSAD) to represent defendant on appeal. OSAD filed a timely motion for leave to file a late notice of appeal pursuant to Illinois Supreme Court Rule 606(c) (eff. Mar. 12, 2021), which this court allowed on June 4, 2021. Accordingly, this court had jurisdiction of

- 10 -

defendant's original appeal under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013). Our supreme court again vested us with jurisdiction to enter a new decision in light of *Ramirez.*

¶ 27                                II. ANALYSIS

¶ 28           On appeal, defendant argues the trial court erred by denying her motion to suppress evidence, the State failed to prove her guilt beyond a reasonable doubt, and alternatively, the court erred when it barred defendant from presenting evidence she did not know her FOID card had been revoked.

¶ 29                           A. Motion to Suppress

¶ 30           Defendant first argues the trial court erred in denying her motion to suppress, which claimed the police lacked reasonable suspicion to lawfully stop her vehicle and the evidence recovered was the fruit of the unlawful stop. Without this evidence, the State could not have proved its case.

¶ 31           Defendant acknowledges she may not have properly preserved her issue for review. We need not address whether defendant's argument was forfeited. Even if it was forfeited, we agree with defendant the "constitutional-issue exception" to the forfeiture doctrine applies because (1) the constitutional issue was properly raised in the trial court, (2) the issue could be raised later in a postconviction petition, and (3) judicial resources would be wasted requiring defendant to raise the issue in a separate proceeding. *People v. Cregan*, 2014 IL 113600, ¶¶ 16, 18, 10 N.E.3d 1196.

¶ 32           "When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion." *People v. Brooks*, 2017 IL 121413, ¶ 22, 104 N.E.3d 417. The defendant must establish a *prima facie* case the evidence in question was obtained as the result of an illegal search or seizure. *Brooks*, 2017 IL 121413, ¶ 22. A *prima facie* showing means the

defendant has the primary responsibility for establishing the legal and factual bases for the motion to suppress. *Brooks*, 2017 IL 121413, ¶ 22. "If a defendant makes a *prima facie* case, the burden shifts to the State to present evidence to counter the defendant's *prima facie* case. [Citation.] However, the ultimate burden of proof remains with the defendant." *Brooks*, 2017 IL 121413, ¶ 22.

¶ 33 The question here is whether Deputy Campbell had reasonable articulable suspicion to stop defendant's vehicle. A challenge to the denial of a motion to suppress entails a two-part standard of review. *Brooks*, 2017 IL 121413, ¶ 21. "Under this standard, a circuit court's factual findings are reversed only if they are against the manifest weight of the evidence, while the court's ultimate legal ruling as to whether suppression is warranted is reviewed *de novo.*" *Brooks*, 2017 IL 121413, ¶ 21.

¶ 34 A citizen has the right to be free from unreasonable searches and seizures under both the United States and Illinois Constitutions. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6. "The cornerstone of the fourth amendment is reasonableness, which seeks to balance the interest in according discretion in enforcing the law for the community's protection and safeguarding against invasions of citizens' privacy." *People v. Hill*, 2020 IL 124595, ¶ 19, 162 N.E.3d 260. For purposes of the fourth amendment, reasonableness normally requires a warrant supported by probable cause. *People v. Love*, 199 Ill. 2d 269, 275, 769 N.E.2d 10, 14 (2002).

¶ 35 However, a police officer may conduct a brief, investigatory stop of an individual if the officer has a reasonable belief the individual has committed or is about to commit a crime. *People v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092 (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). According to our supreme court:

> "The officer must have a 'reasonable, articulable suspicion' that criminal activity
>
> is afoot. [Citation.] Although 'reasonable, articulable suspicion' is a less

demanding standard than probable cause, an officer's suspicion must amount to more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity. [Citation.] The investigatory stop must be justified at its inception and the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the governmental intrusion upon the constitutionally protected interests of the private citizen. [Citation.] In judging the officer's conduct, we apply an objective standard and consider, 'would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' [Citation.] Further, when evaluating the validity of the stop, we consider ' "the totality of the circumstances—the whole picture." ' [Citation.]" *Timmsen*, 2016 IL 118181, ¶ 9.

The standard established in *Terry* has been codified into Illinois law at section 107-14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-14 (West 2018)).

¶ 36    Our supreme court has stated "[v]ehicle stops are subject to the fourth amendment's reasonableness requirement." *People v. Hackett*, 2012 IL 111781, ¶ 20, 971 N.E.2d 1058. When a police officer has probable cause to believe a traffic offense has occurred, the decision to stop a vehicle is reasonable. *Hackett*, 2012 IL 111781, ¶ 20. However, a police officer does not have to have probable cause a traffic violation has occurred to stop a vehicle. *Hackett*, 2012 IL 111781, ¶ 20. "A police officer may conduct a brief, investigatory stop of a person where the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Hackett*, 2012 IL 111781, ¶ 20. "The distinction between these two standards may or may not be relevant, depending upon the facts of the case under

consideration and the Vehicle Code provisions at issue." *Hackett*, 2012 IL 111781, ¶ 20.

¶ 37 At the suppression hearing, Deputy Campbell testified he stopped defendant's vehicle because the exhaust system on her vehicle was defective. According to Deputy Campbell, the vehicle was very loud. While not making an explicit finding, the trial court apparently determined Deputy Campbell's testimony was credible and also found the vehicle's exhaust system was loud. Based on this record, the court's findings are not against the manifest weight of the evidence.

¶ 38 Section 12-602 of the Illinois Vehicle Code (625 ILCS 5/12-602 (West 2018)) states:

> "Every motor vehicle driven or operated upon the highways of this State shall at all times be equipped with an adequate muffler or exhaust system in constant operation and properly maintained to prevent any excessive or unusual noise. No such muffler or exhaust system shall be equipped with a cutout, bypass or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will amplify or increase the noise of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this Section."

Defendant acknowledges in her brief that if Deputy Campbell was not mistaken regarding the noise coming from defendant's vehicle, or even if he was mistaken but the mistake was reasonable, Deputy Campbell would have had reasonable suspicion to stop defendant based on a violation of section 12-602 of the Vehicle Code (625 ILCS 5/12-602 (West 2018)).

¶ 39 Defendant points to the State's argument at trial that the best evidence in this case is the video of what occurred after Deputy Campbell stopped defendant. However, the trial court

also relied on the deputy's testimony regarding why he stopped defendant's car, and as we have noted, the trial court must have found the deputy's testimony credible. As a reviewing court, we will not disturb the court's credibility determination. Further, the video does not refute Deputy Campbell's testimony regarding the noise defendant's vehicle was making on the interstate while the vehicle was driving at a speed of 70 miles per hour.

¶ 40    Defendant also argues this was a pretextual stop and Deputy Campbell pulled defendant over for a trivial reason contradicted by the video evidence. However, as we stated above, the video does not contradict Deputy Campbell's testimony regarding the noise defendant's vehicle was making while going 70 miles per hour on the highway. Further, while defendant considers a violation of section 12-602 of the Vehicle Code (625 ILCS 5/12-602 (West 2018)) to be a trivial reason to stop defendant's vehicle, she provides no real analysis why Deputy Campbell could not pull her over for a violation of that section.

¶ 41    Finally, defendant's appellate counsel implicitly argues Deputy Campbell pulled over defendant because she was African American. Citing concurring opinions by Justice Ginsburg in *Arkansas v. Sullivan*, 532 U.S. 769, 773 (2001) (*per curiam*) (Ginsburg, J., concurring, joined by Stevens, O'Connor, and Breyer, JJ.), and in *District of Columbia v. Wesby*, 583 U.S. 48, 70 (2018) (Ginsburg, J., concurring in the judgment in part), defendant argues courts should sometimes break with the normal rule and consider an officer's subjective motivations for making a stop. However, defendant points to no evidence Deputy Campbell stopped defendant for any reason other than that he had reasonable suspicion based on specific articulable facts defendant was violating section 12-602 of the Vehicle Code (625 ILCS 5/12-602 (West 2018)).

¶ 42    Under our standard of review, we will not reverse a trial court's ruling on a motion to suppress based on an implied and unsupported allegation Deputy Campbell stopped defendant

because she was African American. While the stop does seem unusual, and we are mindful of the perverseness of racial profiling, no evidence was submitted to the trial court which suggested Deputy Campbell pulled defendant over because she was black.

¶ 43                                B. Revoked FOID Card

¶ 44          Defendant originally argued the State's evidence was insufficient to prove her mental state regarding her FOID card being revoked and challenged the trial court's finding a mental state did not apply to that element of the offense. In its supervisory order, the supreme court instructed us to consider the effect of its decision in *Ramirez*, 2023 IL 128123, on the issue of whether the State was required to prove a mental state pertaining to the revocation of defendant's FOID card. *Fields*, No. 129126. The questions of whether the State was required to prove a mental state and, if so, what mental state are questions of law we review *de novo*. See *People v. Pacheco*, 2023 IL 127535, ¶ 48.

¶ 45          Section 2(a)(1) of the Act provides, "No person may acquire or possess any firearm, stun gun, or taser within this State without having in his or her possession a [FOID] Card previously issued in his or her name by the Department of State Police under the provisions of this Act." 430 ILCS 65/2(a)(1) (West 2018). Section 14 of the Act contains the sentencing provisions for section 2(a)(1) and states, in pertinent part the following:

> "(c) A violation of paragraph (1) of subsection (a) of Section 2 is a Class 3 felony when:

>> (1) the person's [FOID] Card is revoked or subject to revocation under Section 8[.]" 430 ILCS 65/14(c)(1) (West 2018).

Accordingly, in this case, the *actus reas* elements the State had to prove were (1) defendant possessed a firearm and (2) defendant's FOID card was revoked. In the trial court, the *mens rea* of

knowledge was attached to the first *actus reas* element, requiring the State to prove defendant knowingly possessed a firearm, but no *mens rea* was attached to the second element.

¶ 46    In her supplemental brief addressing *Ramirez*, defendant asserts the *mens rea* of knowledge also attaches to the second *actus reas* element and, thus, the State had to prove she knew her FOID card was revoked. In its supplemental brief, the State agrees with defendant it had to prove she knew her FOID card was revoked. After considering the *Ramirez* decision and the statute at issue, we agree with the parties.

¶ 47    In *Ramirez*, 2023 IL 128123, ¶ 1, our supreme court addressed section 24-5(b) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/24-5(b) (West 2018)), which prohibits the possession of defaced firearms. It found with that offense the State must prove (1) the defendant possessed a firearm and (2) the firearm was defaced. *Ramirez*, 2023 IL 128123, ¶ 23. As to *mens rea*, the court found the offense was clearly a possessory one, and when a possessory offense fails to prescribe a particular *mens rea* and is not an absolute liability offense, the applicable *mens rea* is knowledge. *Ramirez*, 2023 IL 128123, ¶ 23. That finding was consistent with the holding in *People v. Stanley*, 397 Ill. App. 3d 598, 608, 921 N.E.2d 445, 453 (2009), which this court relied upon in our original opinion, where the reviewing court held the State was required to prove the defendant's knowledge of the first element but not the second. However, the *Ramirez* court further found section 4-3(b) of the Criminal Code (720 ILCS 5/4-3(b) (West 2018)) provides, "if a statute prescribes a mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to each such element." *Ramirez*, 2023 IL 128123, ¶ 23. Thus, it held "section 24-5(b)'s implied *mens rea* of knowledge must apply to both elements of the offense, possession and defacement." *Ramirez*, 2023 IL 128123, ¶ 23. The supreme court then expressly overruled *Stanley* and its progeny. *Ramirez*,

2023 IL 128123, ¶ 24.

¶ 48 Like the offense at issue in *Ramirez*, unlawful possession of a weapon with a revoked FOID card is clearly a possessory offense. See 430 ILCS 65/2(a)(1) (West 2018). As such, the applicable *mens rea* for the possession element is knowledge. *Ramirez*, 2023 IL 128123, ¶ 23. The second element is not distinguished from the possession element with respect to *mens rea*, and thus under section 4-3(b), the *mens rea* of knowledge applies to the second element as well.

¶ 49 Having made this determination, we now must address the proper remedy. In *Ramirez*, the supreme court explained, " 'The double jeopardy clause does not preclude retrial of a defendant whose conviction is overturned because of an error in the trial proceedings leading to the conviction.' " *Ramirez*, 2023 IL 128123, ¶ 29 (quoting *People v. Casler*, 2020 IL 125117, ¶ 57, 181 N.E.3d 767). " '[A] second trial is permitted when a conviction is reversed because of a posttrial change in law. Such a reversal is analogous to one for procedural error and therefore does not bar retrial.' " *Ramirez*, 2023 IL 128123, ¶ 29 (quoting *Casler*, 2020 IL 125117, ¶ 57). There, the supreme court concluded, under the circumstances in that case, the proper remedy was remand for a new trial, at which the State would have the opportunity to prove the defendant knew the firearm was defaced as required by that court's construction of section 24-5(b). *Ramirez*, 2023 IL 128123, ¶ 31.

¶ 50 The supreme court explained the facts of that case as follows:

"At the time of defendant's trial, binding precedent from the First District provided that the State did not have to present evidence that a defendant knew a firearm was defaced. The trial court, in finding defendant guilty, specifically recognized this precedent and found that the State 'only ha[s] to prove that he knowingly possessed the firearm and that the firearm had a defaced or obliterated

serial number.' The State asserts that, had it known of the need to establish that defendant knew the shotgun was defaced, it might, *inter alia*, have introduced photographs of the shotgun showing that the defacement was so clear that it could not have escaped defendant's notice." *Ramirez*, 2023 IL 128123, ¶ 30.

¶ 51    The State asserts we should follow *Ramirez* because, at the time of defendant's trial, an authoritative interpretation of the elements of unlawful possession of a weapon with a revoked FOID card did not exist and decisions such as *Stanley*; *People v. Ivy*, 133 Ill. App. 3d 647, 479 N.E.2d 399 (1985); and *People v. Strode*, 13 Ill. App. 3d 697, 300 N.E.2d 323 (1973), suggested the State did not have to prove a defendant's knowledge of the revocation of his or her FOID card. Defendant asserts this case is distinguishable from *Ramirez* because a posttrial change in law did not take place because the cases cited by the State addressed different statutory provisions than the ones at issue in this case.

¶ 52    In *Ramirez*, the supreme court emphasized both (1) binding precedent provided the State did not have to present evidence of defendant's knowledge regarding the defacement of the firearm and (2) the trial court specifically relied on that binding precedent in finding the State did not have to present such evidence. *Ramirez*, 2023 IL 128123, ¶ 30. Here, no binding case law had addressed the *mens rea* for the second element of the offense. Moreover, at trial, neither the State nor the court cited any case law for the belief the State did not have to prove defendant had knowledge her FOID card was revoked. Thus, unlike the circumstances in *Ramirez*, the record on appeal does not show the State and the court relied on case law that was later specifically overruled. As such, the record does not reveal the State's presentation of evidence was impacted by the case law subsequently overruled. Additionally, we note the State does not argue in its supplemental brief its trial evidence was sufficient to prove defendant's knowledge her FOID card was revoked.

Accordingly, we find defendant is entitled to an outright reversal of her conviction and sentence for unlawful possession of a weapon with a revoked FOID card.

¶ 53 We recognize in *People v. Shelly*, 2024 IL App (3d) 220432, ¶ 34, the reviewing court reached the opposite conclusion and remanded the case to allow the State an opportunity to present evidence in accordance with its construction of the statute. However, there, the reviewing court relied simply on the fact the *Ramirez* decision did not exist at the time of the trial in that case, and thus a posttrial change in law did occur. *Shelly*, 2024 IL App (3d) 220432, ¶ 34. It appeared to overlook the supreme court's emphasis it had overruled binding precedent expressly relied on by the State and trial court (*Ramirez*, 2023 IL 128123, ¶ 30). See *Shelly*, 2024 IL App (3d) 220432, ¶ 34. We also note in *Shelly*, unlike here, the State did not successfully pursue a motion *in limine* which prevented the defendant from presenting evidence on her lack of knowledge of the revocation of her FOID card. In this case, the court's ruling, which was after the State presented its case, only limited defendant's presentation of evidence.

¶ 54       III. CONCLUSION

¶ 55 For the reasons stated, we reverse defendant's conviction and sentence.

¶ 56 Reversed.

¶ 57 PRESIDING JUSTICE CAVANAGH, concurring in part and dissenting in part:

¶ 58 I agree with the majority that *Ramirez* requires reversal. I respectfully disagree, however, with the lack of a remand. I would remand this case for further proceedings, as the supreme court remanded the case in *Ramirez*, 2023 IL 128123, ¶ 31, and as the appellate court remanded the case in *Shelly*, 2024 IL App (3d) 220432.

¶ 59 In deciding not to follow *Shelly* in this regard, the majority reasons that the present case differs from *Ramirez* in two ways: (1) "the record on appeal does not show the State

and the circuit court relied on case law that was later specifically overruled" and (2) "the record does not reveal the State's presentation of evidence was impacted by the case law subsequently overruled." *Supra* ¶ 52. Surely, however, the prosecutor had *some* reason for arguing to the trial court that " 'knowledge of the revocation is not an element' " (*supra* ¶ 22), and surely the court had *some* reason for accepting the prosecutor's argument. It makes no difference whether the prosecutor and the court cited case law. They are presumed to know case law (see *People v. Inman*, 2023 IL App (4th) 230864, ¶ 14; *Jones v. Board of Education of Chicago*, 2013 IL App (1st) 122437, ¶ 22)—including *Stanley*, on which we ourselves previously relied (see *People v. Fields*, 2022 IL App (4th) 210194, ¶¶ 73-74) and which *Ramirez* subsequently overruled (*Ramirez*, 2023 IL 128123, ¶ 24). Presumably on the authority of *Stanley* and its progeny, the prosecutor took the position (as we did) that knowledge of the revocation was not an element. I can only assume that the prosecutor's foregoing presentation of evidence was consistent with that stated position. The State now requests a "remand for a new trial at which both the State and defendant can present evidence on the issue of defendant's knowledge of the revocation"—a request that would seem pointless unless the State had such evidence to present.

¶ 60      As *Shelly* explained, previous case law, such as *Stanley*, 397 Ill. App. 3d at 608, and *People v. Lee*, 2019 IL App (1st) 162563, ¶ 43, exempted the State from proving the defendant's knowledge that his or her FOID card had been revoked. See *Shelly*, 2024 IL App (3d) 220432, ¶ 31. *Ramirez* changed case law by overruling *Stanley* and its progeny, including *Lee*. See *Ramirez*, 2023 IL 128123, ¶ 24. Because of that posttrial change in the law, the appellate court in *Shelly* rightly decided that there should be an opportunity for a retrial under the new law: the State should receive an opportunity to prove the defendant knew his FOID card was revoked, and the defendant should receive an opportunity to prove he did not know his FOID

card had been revoked. See *Shelly*, 2024 IL App (3d) 220432, ¶ 34. For authority, the appellate court in *Shelly* cited *People v. Casler*, 2020 IL 125117, ¶ 57, in which the supreme court held, "[A] second trial is permitted when a conviction is reversed because of a posttrial change in [the] law. Such a reversal is analogous to one for procedural error and therefore does not bar retrial." See *Shelly*, 2023 IL App (3d) 220432, ¶ 34. Those words from *Casler* are directly applicable to this case, and like *Casler*, we should honor those words by remanding this case.

*People v. Fields*, 2024 IL App (4th) 210194-B

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Woodford County, No. 19-CF-114; the Hon. Charles M. Feeney III, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Gregory G. Peterson, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Gregory Minger, State's Attorney, of Eureka (Patrick Delfino, David J. Robinson, Kim Noffke, and David E. Mannchen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |