NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230649-U

NO. 4-23-0649

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 29, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| REZA L. BOX, | ) | No. 21CF274 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court vacated defendant's conviction for possession of a defaced firearm and remanded for further proceedings where the State failed to present evidence that defendant knew about the defacement of the firearm he possessed. The court further held that (1) the trial court did not err in denying a motion to suppress evidence, (2) the evidence was sufficient to convict defendant of possession of a controlled substance, (3) defendant was not entitled to raise a necessity defense against the unlawful use of a weapon by a felon charge, and (4) defendant's conviction for unlawful use of a weapon by a felon did not violate the second amendment to the United States Constitution (U.S. Const., amend. II).

¶ 2    Following a bench trial, defendant, Reza L. Box, was found guilty of possession of cannabis with intent to deliver (720 ILCS 550/5(d) (West 2020)) (count IV), possession of a firearm with a defaced serial number (720 ILCS 5/24-5(b) (West 2020)) (count V), unlawful use of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2020)) (count VI), and possession of a controlled substance (720 ILCS 570/402(c) (West 2020)) (count VII). The trial court found defendant not guilty of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West

2020)) (count I) and two counts of armed violence (720 ILCS 5/33A-2(a) (West 2020)) (counts II and III). Defendant appeals, arguing (1) the court erroneously denied his motion to suppress evidence, (2) the State failed to prove beyond a reasonable doubt that defendant committed possession of a controlled substance and possession of a firearm with a defaced serial number, (3) the court erroneously determined that defendant was not entitled to a necessity defense, and (4) defendant's UUWF conviction violates the second amendment to the United States Constitution (U.S. Const., amend. II). We vacate defendant's conviction for possession of a firearm with a defaced serial number and remand for further proceedings on that count but affirm on all other grounds.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was charged with the aforementioned offenses following his February 13, 2021, arrest. On that date, officers observed a handgun with a filed-off serial number on the floorboard of the vehicle defendant was in. After detaining defendant, officers also located cocaine and marijuana in the vehicle.

¶ 5                                 A. Motion to Suppress

¶ 6        On April 29, 2021, defendant filed a "motion to quash arrest & suppress physical evidence." Therein, defendant requested the trial court "suppress physical evidence seized" from his vehicle because the arresting officers lacked probable cause or reasonable suspicion to detain him.

¶ 7        The trial court held a hearing on the motion to suppress on July 13, 2021. Sergeant Greg Yalden of the Rockford Police Department testified to the following. On February 13, 2021, Yalden was patrolling "the area of the Aragona Club" in Rockford in an unmarked car. As Yalden was driving, he observed an individual he knew "from prior contact" as Von Johnson leaning into

the front driver's window of a gray Nissan. Johnson was speaking with defendant, who was sitting in the driver's seat of the Nissan. Johnson saw Yalden and immediately walked toward a nearby white Pontiac. The Pontiac, however, drove away. As Yalden observed this, he saw a bulge in Johnson's front left pocket. Yalden drove around the block and returned to the scene. As Yalden rounded a corner, he saw Johnson sitting in the front passenger seat of the Nissan. Defendant was still sitting in the driver's seat. Both then exited the Nissan, walked toward a Hyundai Santa Fe that was parked nearby, and sat in the back seat before the Hyundai drove away. Yalden did not see defendant holding anything, and he could not tell whether Johnson still had an object in his pocket.

¶ 8        After the Hyundai drove away, Yalden requested other officers to meet him at the parked Nissan to see whether anything was discarded and to investigate why defendant and Johnson quickly left the vehicle. Before backup arrived, Yalden parked and walked to the Nissan. Yalden shined his light through the front passenger window and observed in plain view an uncased handgun on the passenger floorboard with its serial number filed off. The gun was next to a black fanny pack. After other officers arrived, they conducted surveillance on the vehicle, waiting for defendant and Johnson to return to detain them for an uncased and defaced firearm. About 19 minutes later, the Hyundai returned and pulled up behind the Nissan. Defendant exited the rear seat on the driver's side of the Hyundai and got into the driver's seat of the Nissan. When defendant started the vehicle, Yalden and the officers activated their vehicles' lights, converged, and took defendant into custody. Yalden testified that, although the gun was found on the passenger-side floorboard where Johnson had been sitting, defendant was the driver and the only occupant of the vehicle where the handgun was found.

¶ 9 Officer Jeremiah Cizerle of the Rockford Police Department testified next, and his testimony was substantially like Yalden's. Cizerle noted that upon arriving at the scene, he observed a parked Nissan. Yalden directed him to the front passenger-side floorboard of the vehicle, where he saw a black handgun next to a black fanny pack. Cizerle observed that the firearm's serial number was scratched off. Cizerle testified that officers surveilled the Nissan until another vehicle approached the area. After defendant got out of that vehicle, he entered the Nissan and was inside for 30 to 40 seconds before he turned on the headlights. At that time, officers activated their emergency lights and initiated a traffic stop. When defendant exited the Nissan, he was wearing the fanny pack that had been next to the firearm on the floorboard. After defendant was taken into custody, officers searched the vehicle and saw that the firearm had been moved completely under the passenger seat.

¶ 10 The trial court denied defendant's motion to suppress. The court found that defendant was the sole occupant of a vehicle with a firearm that had been on the floorboard, which officers saw was uncased and had a defaced serial number. The court noted that it was illegal to transport the firearm while uncased and to possess a firearm with a defaced serial number. Accordingly, the court found that officers had reasonable suspicion to stop defendant.

¶ 11 B. Bench Trial on AHC and UUWF

¶ 12 On October 7, 2021, defendant filed a motion to sever the AHC and UUWF counts from the remaining counts, and the trial court granted that motion on October 21, 2021.

¶ 13 A bench trial on the AHC and UUWF counts commenced on January 19, 2022. The State first called Yalden, whose testimony was substantially like his testimony from the motion to suppress hearing. Yalden testified, *inter alia*, that he was patrolling the area near the Aragona at 1 a.m. and saw Johnson talking to defendant, who was in a Nissan. After defendant and Johnson left

in a nearby Hyundai, Yalden approached the Nissan and shined a light through the front passenger window. Yalden observed a handgun in plain view next to a black fanny pack on the passenger-side floorboard. Yalden could "see plainly" that the handgun's serial number had been scratched or filed off. After additional officers arrived, they conducted surveillance on the Nissan until the Hyundai returned. Defendant exited the rear driver's door of the Hyundai and entered the Nissan. Once defendant got into the Nissan, the officers converged and arrested defendant. On cross-examination, Yalden acknowledged that "there were a lot of people" outside the Aragona and that it was busy.

¶ 14        Cizerle's testimony also mirrored his testimony from the motion to suppress hearing. Cizerle testified, *inter alia*, that he met with Yalden at the Nissan and, upon looking inside, observed a black handgun on the front passenger-side floorboard, inches away from a black fanny pack. The serial number of the handgun was scratched off, and the barrel was facing the passenger-side door. After surveilling the Nissan for about 20 minutes, another vehicle arrived, which defendant exited before getting into the driver's seat of the Nissan. Cizerle "observed the headlights come on, the vehicle came on," and the officers activated their emergency lights and initiated a traffic stop. Defendant exited the Nissan and was wearing the black fanny pack that had been on the passenger-side floorboard. Defendant was detained, and when Cizerle informed defendant that officers had located a gun, defendant said the gun was Johnson's. Upon searching the Nissan, Cizerle observed that the fanny pack was no longer there, and the gun was moved to underneath the passenger seat. The gun was a loaded Taurus G3 9-millimeter with its serial number scratched off. The handgun was admitted into evidence. The State also introduced photographs of, *inter alia*, the interior of the Nissan and the handgun as it appeared under the passenger seat when officers located it after defendant's arrest.

¶ 15　　　　　Detective Nicholas Weber testified that he was a crime scene detective who assisted in the recording and processing of evidence. Weber test-fired the handgun and found it was operational. Weber attempted to collect forensic evidence from the firearm, such as DNA or fingerprints, but he was unable to develop any latent evidence of comparable value.

¶ 16　　　　　The State introduced certified copies of defendant's prior convictions for possession of a firearm by a felon, aggravated unlawful use of a weapon, residential burglary, and conspiracy to commit armed robbery.

¶ 17　　　　　Defendant testified in his own defense to the following. On February 13, 2021, he went to a friend's house, where there were 10 to 15 people. The group decided to go to the Aragona, and Johnson asked to ride with defendant because another car was full. Defendant, who was driving his cousin's Nissan, agreed. When they arrived at the Aragona, defendant parked and got out of the Nissan. He realized that he still had his bag on, and because bags were not allowed in the Aragona, he took it off and threw it back into the Nissan. Johnson also exited. Defendant saw Johnson speaking with people in a Hyundai that had pulled up. Johnson got into the rear passenger seat of the Hyundai. Defendant approached the Hyundai and asked for a ride to the liquor store, and the driver agreed.

¶ 18　　　　　After spending five to seven minutes at the liquor store, defendant asked to be taken back to the Aragona, but Johnson did not want to leave. Despite this, the driver agreed to drive them back. Johnson sat next to defendant in the back seat of the Hyundai, and when they arrived, defendant got out and went back to the Nissan. Defendant got into the Nissan but did not start it. Defendant saw his fanny pack on the floor. As he grabbed it, he felt a hard object next to it. Defendant determined that the object was a firearm and noted that it was on the side of the vehicle where Johnson had been sitting. Defendant said he had no knowledge of the firearm when he

entered the Nissan. Defendant explained that the only thing he brought with him was a fanny pack, and he was the only person in the vehicle. The firearm was in "plain sight," and he decided that the "best thing" was not to leave the firearm showing. Defendant "scooted it back with my fanny pack," without touching the gun himself. Defendant did not try to take physical control of the firearm. He exited the Nissan with his fanny pack over his shoulder, and after closing the door, he saw lights "everywhere."

¶ 19 On cross-examination, defendant testified that Johnson never spoke with him at defendant's driver's-side window; Johnson was speaking with someone from a different vehicle. The first time defendant observed the firearm was when he returned to the Nissan, and he did not know what to do with it. Defendant did not call the police to tell them that there was a firearm in his car because he had no time. Defendant felt that pushing it under the seat was "the best thing" to avoid it being seen by others. After the officers activated their lights and approached, defendant "shouted a lot of stuff" and asked why he was being arrested. Defendant acknowledged that he did not immediately inform the police that he had a handgun and only told police the gun was Johnson's after they told him he was being arrested for "the gun in your car."

¶ 20 At the conclusion of the evidence, defendant argued that he was entitled to raise the defense of necessity because he did not know about the firearm until he saw it on the floorboard of the Nissan. He argued that, because the firearm was in plain view in a busy area, he believed the best option was to push it under the passenger seat and out of sight. The trial court denied defendant's request to raise a necessity defense, concluding that it had "some concerns" about defendant's testimony. Among the concerns was that, although defendant claimed to push the firearm under the passenger seat with his bag, the firearm looked to have been flipped over in the photograph showing it under the passenger seat, suggesting to the court "more than a quick push

with an encumbered hand." The court further found that defendant failed to define a "specific and immediate threat" to him that required him to act as he did. The court also noted that, even if no such threat needed to be shown, defendant was not entitled to a necessity defense under these circumstances because there "were other options available to him other than shoving the gun under the seat and other ways he could have handled the situation."

¶ 21 The trial court found defendant guilty of UUWF and, initially, AHC. Defendant subsequently argued, however, that the court's guilty verdict on the AHC count was erroneous because the predicate offense of conspiracy to commit armed robbery was not a forcible felony. The court agreed and ultimately entered a not guilty finding on the AHC count.

¶ 22 C. Bench Trial on the Remaining Counts

¶ 23 On December 16, 2022, the matter proceeded to a bench trial on the remaining counts of armed violence, possession with intent to deliver cannabis, possession of a firearm with a defaced serial number, and possession of a controlled substance. The following relevant evidence was adduced.

¶ 24 Cizerle testified that, after he and other officers activated their vehicles' emergency lights, defendant stepped out of his Nissan wearing a black fanny pack across his chest. After detaining defendant, officers searched the bag and found 85 grams of suspected cannabis. Cizerle then searched the Nissan and found (1) a bag of suspected cannabis and a digital scale by the shifter and (2) another bag of suspected cannabis and a bag containing a substance that tested positive for cocaine inside the center console. Cizerle explained that officers transported defendant to the police department to interview him. A video of the interview was entered into evidence. This court has reviewed the video, though portions of the audio are difficult to hear.

¶ 25        During the interview, defendant told officers that, after returning from the liquor store, Johnson asked him to "get my stuff" and to "get me my drugs" from the Nissan. Defendant stated that he only sold "weed" and admitted that he had "weed" in his bag. Defendant stated that he knew Johnson sold cocaine. An officer then asked where the "crack" was. Defendant's response is difficult to hear, but he seems to respond, "I'm not sure, under the armrest it was there. That's what I was grabbing to take to him." To clarify, the officers asked whether, by "armrest," defendant meant "where you put your arm, or, like, what you lift up." Defendant responded that he could not remember if it was "in the second part or the first part," but noted that he "grabbed it." To further clarify, the officers asked whether it was "inside the center console," and defendant answered, "Yeah, that's where it was at." The officers asked what defendant did after he grabbed the bag, and defendant responded, "[Y]ou guys pulled up just then. I was going to take it to him."

¶ 26        The parties stipulated that the substances recovered from the Nissan were cannabis and cocaine.

¶ 27        The parties agreed to incorporate defendant's testimony from his first bench trial. Defendant also testified again in his own defense. Defendant explained that after returning to the Nissan from the liquor store, he intended to grab his mask and go into the Aragona. When officers detained him, he was outside the vehicle and was wearing his fanny pack, which contained marijuana. Defendant was upset and asked the officers why he was being arrested. On cross-examination, defendant explained that when he reached for his mask, he noticed his fanny pack on the floor and grabbed it. At that point, he observed a gun. Defendant "pushed the gun under the seat" and "just grabbed what belonged" to him before exiting the car. Defendant acknowledged that Johnson asked him to "get his stuff" when defendant went back to the Nissan. Defendant further acknowledged that he "believe[d]" that Johnson's "stuff" was cocaine, but he

was not positive. Defendant testified that he picked up and dropped what he thought was cocaine from the top of the shifter but claimed he later determined he had only picked up marijuana.

¶ 28     During closing arguments, the State argued that defendant was ultimately in control of the Nissan and its contents. Further, contrary to defendant's claims, the cocaine was defendant's, and he knew that it was in the center console. The State asserted that during defendant's interview with the police, he noted that Johnson asked him to "go get his stuff out of the car, which he knew to mean either a gun or cocaine, and that he was going to go retrieve those items." Additionally, defendant admitted "that he picked up the bag of cocaine" and dropped it "once he realized that the police were present." The State explained that defendant "had immediate access to the firearm, as he had just touched it and he had just moved it underneath the passenger seat."

¶ 29     The trial court found defendant not guilty of the armed violence counts. The court found defendant guilty of possession of cannabis with intent to deliver, possession of a firearm with a defaced serial number, and possession of a controlled substance. The court explained that the evidence established defendant was driving and had primary responsibility for the vehicle. Additionally, the court noted that there was no evidence that Johnson, who was the only other individual in the Nissan, went "into the console." The court sentenced defendant to prison for concurrent terms of (1) 11 years for UUWF, (2) 8 years for possession with intent to deliver cannabis, (3) 8 years for possession of a firearm with a defaced serial number, and (4) 5 years for possession of a controlled substance.

¶ 30     This appeal followed.

¶ 31                              II. ANALYSIS

¶ 32     On appeal, defendant argues that (1) the trial court erred by denying his motion to suppress evidence, (2) the State failed to prove his guilt beyond a reasonable doubt of possession

of a controlled substance and possession of a defaced firearm, (3) the court erred in finding defendant was not entitled to a necessity defense as to the UUWF charge, and (4) defendant's conviction for UUWF violates the second amendment to the United States Constitution.

¶ 33                    A. Motion to Suppress Evidence

¶ 34        Defendant argues that the trial court erred in denying his motion to suppress evidence obtained from the Nissan because the officers did not have reasonable suspicion to detain him.

¶ 35        We employ a two-part standard of review of a ruling on a motion to suppress. *People v. Fields*, 2024 IL App (4th) 210194-B, ¶ 33. We will reverse the trial court's findings of fact if they are against the manifest weight of the evidence. *Fields*, 2024 IL App (4th) 210194-B, ¶ 33. A finding is deemed against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence that was presented. *People v. Patton*, 2022 IL App (4th) 210561, ¶ 88. By contrast, the court's conclusions of law are reviewed *de novo*. *Fields*, 2024 IL App (4th) 210194-B, ¶ 33.

¶ 36        Both the United States and Illinois Constitutions prohibit unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The touchstone of fourth amendment analysis is reasonableness, which balances the interest in enforcing the law against the invasion of a citizen's privacy. *Fields*, 2024 IL App (4th) 210194-B, ¶ 34. Typically, reasonableness requires a warrant supported by probable cause. *Fields*, 2024 IL App (4th) 210194-B, ¶ 34. However, "a police officer may conduct a brief, investigatory stop of an individual if the officer has a reasonable belief the individual has committed or is about to commit a crime." *Fields*, 2024 IL App (4th) 210194-B, ¶ 35. The stop must be supported by the officer's reasonable, articulable suspicion, *i.e.*, more than an inchoate and unparticularized suspicion of criminal

activity. *Fields*, 2024 IL App (4th) 210194-B, ¶ 34. Additionally, the stop must be justified at its inception, and the officer must point to specific, articulable facts which, along with rational inferences therefrom, reasonably warrant the government invading a private citizen's constitutionally protected interests. *Fields*, 2024 IL App (4th) 210194-B, ¶ 35. We judge the officer's conduct by an objective standard, considering whether the facts available would lead a reasonable person to believe that the action taken was appropriate. *Fields*, 2024 IL App (4th) 210194-B, ¶ 35. Moreover, we assess the validity of the stop in light of the totality of the circumstances. *Fields*, 2024 IL App (4th) 210194-B, ¶ 35.

¶ 37 Defendant argues that the trial court erred in denying his motion to suppress evidence because the officers did not have reasonable suspicion to detain him. Specifically, defendant contends that whether the officers had reasonable suspicion "hinged on the officers' bare testimony that they were able to see, in plain view prior to the search, that the firearm's serial number was defaced." Defendant asserts Yalden's and Cizerle's testimony that they could see a defaced serial number was unbelievable because the officers' purported observation occurred while it was dark, and the officers were looking through the passenger window of the Nissan at a black handgun on the black floorboard. Given our deferential standard of review of factual findings, this argument is unpersuasive.

¶ 38 "When ruling on a motion to suppress evidence, the trial court often must choose between competing versions of fact and weigh the credibility of witnesses." *People v. Lashmet*, 372 Ill. App. 3d 1037, 1040 (2007). We thus give "great deference" to the trial court's ruling on a motion to suppress, as the trial judge "is in the best position to determine the credibility of witnesses and to resolve any conflict in their testimony." *People v. Ortiz*, 317 Ill. App. 3d 212, 219 (2000).

¶ 39 Here, Yalden testified that he observed defendant sitting in the driver's seat of the Nissan until defendant eventually left with Johnson in another vehicle. After walking up to the Nissan, Yalden shined his light through the front passenger-side window. Yalden saw in plain view a handgun on the passenger-side floorboard. The handgun was uncased, and Yalden explicitly testified that he was able to observe that the serial number of the firearm had been filed off. In turn, Cizerle testified that Yalden directed him to the passenger floorboard, and when he looked, he also saw a black handgun with the serial number scratched off. Defendant is correct that the evidence showed that Cizerle's and Yalden's observations occurred around 1 a.m. and that the handgun was black against the black floorboard of the Nissan. Despite this, the trial court was in the best position to assess the credibility of Yalden's and Cizerle's testimonies that they could see a defaced serial number on the handgun. The court reasonably determined that their testimony was credible, and we defer to that determination. Accordingly, we conclude that the court's finding was not against the manifest weight of the evidence. As it is illegal to possess a firearm with an altered, removed, or obliterated serial number (720 ILCS 5/24-5(b) (West 2020)), the court properly found that the officers had reasonable suspicion to detain defendant, whom they observed in the driver's seat of the Nissan where the handgun was found. Thus, we hold that the court did not err in denying defendant's motion to suppress evidence.

¶ 40                                 B. Sufficiency of the Evidence

¶ 41 Defendant argues that the State failed to prove his guilt beyond a reasonable doubt of both possession of a controlled substance and possession of a defaced firearm.

¶ 42 When reviewing challenges to the sufficiency of the evidence, this court will not retry the defendant. *People v. Jones*, 2023 IL 127810, ¶ 28. Instead, we ask whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

- 13 -

the essential elements of the offense beyond a reasonable doubt." (Emphasis added.) *Jones*, 2023 IL 127810, ¶ 28. We will not substitute our judgment for the trial court's on issues regarding the weight of the evidence or the credibility of witnesses. *Jones*, 2023 IL 127810, ¶ 28. Additionally, we will draw all reasonable inferences from the evidence in favor of the State. *Jones*, 2023 IL 127810, ¶ 28. We will not overturn a criminal conviction "unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Jones*, 2023 IL 127810, ¶ 28.

¶ 43                                   1. *Possession of a Controlled Substance*

¶ 44          Defendant argues that the State failed to prove beyond a reasonable doubt that he possessed the cocaine recovered from the vehicle.

¶ 45          To prove defendant guilty of possessing a controlled substance, the State must prove that he knowingly possessed a controlled substance. 720 ILCS 570/402(c) (West 2020). Possession falls into two categories, actual and constructive. *People v. Johnson*, 2013 IL App (4th) 120162, ¶ 24. " 'Actual possession exists where the defendant exhibits some form of dominion over the unlawful substance, such as trying to conceal it or throw it away.' " (Internal quotation marks omitted.) *Johnson*, 2013 IL App (4th) 120162, ¶ 24 (quoting *People v. Scott*, 2012 IL App (4th) 100304, ¶ 19). A defendant exercises constructive possession where he or she has " 'no actual personal present dominion over the narcotics, but there is an intent and a capability to maintain control *** over them.' " (Internal quotation marks omitted.) *Johnson*, 2013 IL App (4th) 120162, ¶ 24 (quoting *Scott*, 2012 IL App (4th) 100304, ¶ 19). "To establish constructive possession, the State must prove that the defendant knew contraband was present and that the defendant exercised immediate and exclusive control over the area where the contraband was found." *Jones*, 2023 IL 127810, ¶ 30. "The rule that possession must be exclusive does not mean, however, that the

possession may not be joint." *People v. Givens*, 237 Ill. 2d 311, 335 (2010). If several individuals intend to exercise control over an object, then each has possession. *Givens*, 237 Ill. 2d at 335.

¶ 46        Knowledge is rarely shown by direct proof, and therefore, it is typically proved by circumstantial evidence. *People v. Sanchez*, 375 Ill. App. 3d 299, 301 (2007). Knowledge can be proved where the State presents sufficient evidence from which the fact finder can reasonably infer that the defendant knew of the controlled substance's existence at the place officers found it. *Sanchez*, 375 Ill. App. 3d at 301. Such evidence can include the defendant's acts, conduct, or statements, as well as the surrounding facts and circumstances. *Sanchez*, 375 Ill. App. 3d at 301. Additionally, "proof that a defendant had control over the premises where contraband is located gives rise to an inference of knowledge and possession of that contraband." *Jones*, 2023 IL 127810, ¶ 30.

¶ 47        Viewing the evidence in the light most favorable to the State, we conclude that the trial court reasonably concluded that defendant constructively possessed the cocaine recovered from the Nissan. The evidence showed that defendant was driving the Nissan the night the cocaine was discovered. Thus, defendant had control of the vehicle. While the evidence showed that Johnson accompanied defendant in the Nissan at one point, there was no indication that Johnson accessed the console. Further, defendant admitted during his police interview that he knew Johnson sold cocaine, Johnson asked defendant to return his "stuff," and defendant believed Johnson's "stuff" was cocaine. Moreover, after officers asked defendant where the "crack" was, he responded that it was in the center console and that he grabbed it.

¶ 48        On appeal, defendant contends the video of his police interview does not definitively show that he knew cocaine was in the Nissan. He argues that, immediately after being asked where the "crack" was, he stated he was not "sure," and this, coupled with his testimony that

he initially thought he grabbed a bag of cocaine from the console but, instead, grabbed a bag of marijuana, established that he had no knowledge of the cocaine in his vehicle. The audio of defendant's immediate response when asked where the "crack" was is difficult to discern, but it sounds as if defendant responds, "I'm not sure, on the armrest it was there. That's what I was grabbing to take to him." Contrary to defendant's claim, this statement could be interpreted to establish that defendant had knowledge of the cocaine.

¶ 49 Even if we disregarded that specific comment because it is difficult to discern, the subsequent questioning also suggested that defendant had knowledge of the cocaine. Specifically, the officers asked additional questions, such as whether by "armrest" defendant meant the interior of the center console. Each of these questions followed the officers asking specifically about "crack," and they did not reference any other drugs during this portion of the questioning. Defendant, in turn, did not seek clarification about what drugs the officers were asking about or inform the officers that he had no knowledge of the cocaine. The trial court, therefore, could reasonably conclude that defendant understood the officers' questioning at this point in the interview to be specifically about cocaine, *i.e.*, whether there was cocaine in the center console. In response to this questioning, defendant explained that by "armrest," he meant the interior of the center console, and he admitted that he "grabbed it." Given this context, the court could reasonably conclude that defendant admitted to knowing that there was cocaine in the center console and grabbing it. "It is the responsibility of the trier of fact to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence." *People v. Johnson*, 334 Ill. App. 3d 666, 678 (2002). The court observed the video of defendant's interrogation, and as it was in the best position to weigh the evidence, it was free to resolve any inconsistencies and to accept or reject as much of defendant's

testimony as it pleased. *People v. Love*, 404 Ill. App. 3d 784, 787 (2010). Based upon defendant's admissions during his police interview, the court was free to disregard his claims at trial that he did not know there was cocaine in the Nissan and that he only picked up a bag of marijuana.

¶ 50 Defendant argues *People v. Gore*, 115 Ill. App. 3d 1054 (1983), and *People v. Hampton*, 358 Ill. App. 3d 1029 (2005), establish that the trial court erred in concluding that he had knowledge and control of the cocaine, because he did not own the Nissan and Johnson was in the Nissan for the "vast majority" of the time. However, both cases are distinguishable.

¶ 51 In *Gore*, the defendant borrowed a vehicle and drove to a tavern with two other individuals. *Gore*, 115 Ill. App. 3d at 1055-56. At the time the defendant borrowed the vehicle, there were beer cans on the floorboard. *Gore*, 115 Ill. App. 3d at 1055. After leaving the tavern, the defendant's vehicle was stopped due to erratic driving, and a search of the vehicle revealed open beer cans and a bag of cannabis under the front passenger's seat. *Gore*, 115 Ill. App. 3d at 1056-57. The defendant was convicted of, *inter alia*, unlawful possession of cannabis, and he appealed, arguing the State did not prove he possessed the bag of cannabis. *Gore*, 115 Ill. App. 3d at 1055-56. The appellate court agreed, determining that, because the defendant was traveling with passengers and there was no evidence he ever had exclusive control of the place where the cannabis was discovered, any of the passengers could have been responsible for the cannabis, and therefore, defendant's guilt was not established beyond a reasonable doubt. *Gore*, 115 Ill. App. 3d at 1058.

¶ 52 In *Hampton*, the defendant was driving, for the first time, a vehicle that was registered to his brother, who had passed away a month prior. *Hampton*, 358 Ill. App. 3d at 1030. An officer pulled over the defendant, who was the sole occupant of the vehicle, because the vehicle's temporary registration was expired. *Hampton*, 358 Ill. App. 3d at 1030. A subsequent search of the vehicle revealed a firearm inside the glove compartment. *Hampton*, 358 Ill. App. 3d

at 1030. Defendant was convicted of unlawful use of a weapon by a felon, and the defendant appealed, arguing that the State failed to prove that he knew there was a weapon in the vehicle. *Hampton*, 358 Ill. App. 3d at 1030-31. The appellate court agreed, concluding that, because the evidence showed the defendant did not have regular and ongoing control of the vehicle, the State could not rely on an inference of knowledge stemming from the defendant's mere presence in the vehicle. *Hampton*, 358 Ill. App. 3d at 1032-33. Additionally, because the State presented no other evidence of knowledge, the State failed to establish that the defendant knowingly possessed the handgun. *Hampton*, 358 Ill. App. 3d at 1032-33.

¶ 53 Unlike *Gore*, the State presented evidence that defendant had exclusive control of the Nissan. The evidence established that, although defendant drove to the Aragona with Johnson, after they left in another vehicle and returned from a liquor store, defendant was the only individual to return to and enter the Nissan. Further, unlike *Hampton*, the State presented evidence from which a rational fact finder could find that defendant had knowledge of the cocaine. As explained above, the evidence established that Johnson had asked defendant to get his "stuff," which defendant believed included cocaine. Defendant went back to the Nissan intending to retrieve it, and defendant admitted during his police interview that he grabbed a bag of cocaine from the center console.

¶ 54 We conclude that, when viewing the evidence in the light most favorable to the State, the evidence was sufficient for a reasonable fact finder to conclude that defendant knowingly and constructively possessed cocaine.

¶ 55 2. *Possession of a Defaced Firearm*

¶ 56 Defendant also argues the State failed to prove that he knew the serial number on the handgun was defaced.

¶ 57        Defendant was convicted of section 24-5(b) of the Criminal Code of 2012 (Code) (720 ILCS 5/24-5(b) (West 2020)). Section 24-5(b) provides, "A person who possesses any firearm upon which any such importer's or manufacturer's serial number has been changed, altered, removed or obliterated commits a Class 3 felony." 720 ILCS 5/24-5(b) (West 2020).

¶ 58        Relying on *People v. Ramirez*, 2023 IL 128123, defendant argues the State had to prove that he knew that the firearm was defaced. Defendant contends that, per *Ramirez*, his conviction for possession of a defaced firearm should be vacated and the matter remanded for a new trial on that count.

¶ 59        In *Ramirez*, police executed a search warrant at the defendant's residence and recovered a shotgun from under the defendant's mattress with its serial number scratched off. *Ramirez*, 2023 IL 128123, ¶¶ 3-4. The defendant was charged with possession of a firearm with a changed, altered, removed, or obliterated serial number, and while the parties stipulated that the serial number had been defaced, the State presented no direct evidence that the defendant knew of the defacement. *Ramirez*, 2023 IL 128123, ¶ 6. Following his conviction, the defendant appealed to the Illinois Supreme Court, arguing that the State needed to prove that he knew the firearm was defaced. *Ramirez*, 2023 IL 128123, ¶¶ 7, 12. The court agreed, concluding that a person must knowingly possess a defaced firearm *and* know such firearm is defaced to be convicted under section 24-5(b). *Ramirez*, 2023 IL 128123, ¶ 23. The court reasoned that section 24-5(b) is a possessory offense for which knowledge is the appropriate mental state and that the mental state of knowledge applied to both the possession and defacement elements of the offense. *Ramirez*, 2023 IL 128123, ¶¶ 22-23. Accordingly, the court determined the State was required to prove that the defendant knew the firearm was defaced to convict him of violating section 24-5(b). *Ramirez*,

2023 IL 128123, ¶ 23. Because the reversal of the defendant's conviction was due to a posttrial change in the law, the court remanded the case for a new trial. *Ramirez*, 2023 IL 128123, ¶¶ 29-31.

¶ 60    Given *Ramirez*'s holding, the State concedes that defendant is entitled to a new trial on the possession of a defaced firearm charge. The State asserts the record established that the handgun's defaced serial number was in plain view, and had the prosecution known that it needed to prove defendant knew of the defacement, it would have introduced the handgun into evidence at the second bench trial "to show that the defacement was so clear that it could not have escaped defendant's notice." Under these circumstances, we accept the parties' agreement that the proper remedy is to vacate defendant's conviction for possession of a defaced firearm and remand for a new trial on that charge. *Ramirez*, 2023 IL 128123, ¶¶ 30-31.

¶ 61                              C. Necessity Defense

¶ 62    Defendant argues the trial court erred in determining that he was not entitled to raise a necessity defense to the UUWF charge.

¶ 63    The necessity defense is outlined in section 7-13 of the Code, which provides:

> "Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7-13 (West 2020).

To raise the defense of necessity, the defendant must show some evidence that he (1) "was without blame in occasioning or developing the situation" and (2) "reasonably believed that his conduct was necessary to avoid a greater public or private injury than that which might reasonably have resulted from his conduct." *People v. Janik*, 127 Ill. 2d 390, 399 (1989). A necessity defense is

viewed as a "choice between two admitted evils where other optional courses of action are unavailable [citations] and the conduct chosen must promote some higher value than the value of literal compliance with the law." *Janik*, 127 Ill. 2d at 399.

¶ 64    The parties dispute whether a necessity defense also requires a showing that the defendant faced an immediate threat of harm. In particular, defendant argues, while *People v. Kite*, 153 Ill. 2d 40, 45 (1992), referenced a "specific and immediate threat" in the context of the defendant raising a necessity defense, that requirement applies only to inmates raising the defense in the context of prison escapes. The State responds that defendant's interpretation of *Kite* is too narrow.

¶ 65    In *Kite*, after the defendant, an inmate at a corrections facility, was found to possess a knife in 1989, the defendant was charged with possession of a knife by a person in custody of a corrections facility. *Kite*, 153 Ill. 2d at 42. At trial, the defendant testified that in 1987 and 1988, prison officials conspired to have him slain by other inmates, and though he claimed officials passed weapons to other inmates to do so, the defendant named neither the officials nor the inmates involved. *Kite*, 153 Ill. 2d at 43. The defendant tendered jury instructions on the affirmative defense of necessity. *Kite*, 153 Ill. 2d at 43. The trial court denied the instruction, and after the defendant was convicted, the appellate court reversed his conviction. *Kite*, 153 Ill. 2d at 43. The State appealed, and the supreme court reversed the appellate court, concluding the trial court could have properly found that a necessity instruction was unwarranted due to a lack of credible evidence warranting it. *Kite*, 153 Ill. 2d at 48. In reaching that conclusion, the court explained that case law had established three factors "to determine when an inmate may be entitled to a necessity defense instruction in the context of a case involving the possession of a weapon in prison." *Kite*, 153 Ill. 2d at 45. Those factors were: (1) the prisoner is faced with—in the immediate future—a specific

threat of death, forcible sexual attack, or substantial bodily injury; (2) there is no time to complain to authorities or there is a history of complaints being futile; and (3) the inmate has no time or opportunity to resort to the courts. *Kite*, 153 Ill. 2d at 45. In opining on these factors, the court noted that a "specific and immediate threat, however, constitutes the very nature of a necessity defense; thus, proof of that factor is a threshold requirement for its establishment. Failure to prove the existence of a specific and immediate threat obviates the need to conduct an inquiry into the second and third factors." *Kite*, 153 Ill. 2d at 45. The court continued, "the defense of necessity arises when a person reasonably believes his conduct, which would otherwise constitute an offense, was necessary to avoid a public or private injury greater than the injury which might have resulted from his conduct." *Kite*, 153 Ill. 2d at 46. Accordingly, "[a]bsent a specific and immediate threat, an inmate is not faced with such a choice." *Kite*, 153 Ill. 2d at 46. The supreme court concluded that the defendant's "vague, uncorroborated testimony, coupled with the length of time between the alleged events, do not support a finding of a specific and immediate threat." *Kite*, 153 Ill. 2d at 47.

¶ 66       Defendant seizes on the supreme court's language that, "[a]bsent a specific and immediate threat, an *inmate* is not faced with such a choice" to argue that *Kite*'s requirement of proof of a specific and immediate threat was intended to apply only in the "prison escape context." (Emphasis added.) *Kite*, 153 Ill. 2d at 46. Defendant, however, disregards other language from *Kite* suggesting that the requirement of such proof was not intended to apply in such limited circumstances. For example, defendant disregards that the court stated, without qualification, that a "specific and immediate threat *** constitutes the very nature of a necessity defense." *Kite*, 153 Ill. 2d at 45. Similarly, the court explained that "[p]roof of a specific and immediate threat

continues to be the threshold requirement for the establishment of a necessity defense." *Kite*, 153 Ill. 2d at 47.

¶ 67　　　　Defendant responds that the First District, in *People v. Crowder*, 2018 IL App (1st) 161226, ¶ 33, stated, "Necessity does not require the defendant to show any imminent risk of harm." However, that assertion was unsupported by any case law, including *Kite*, which the First District had cited elsewhere in the opinion. See *Crowder*, 2018 IL App (1st) 161226, ¶¶ 23, 33. Indeed, this court has previously affirmed the requirement that a threat of immediate harm is necessary to raise a necessity defense. See *People v. Brown*, 2023 IL App (4th) 220399, ¶ 27 ("A necessity defense requires that 'the threat of harm was immediate and defendant's conduct was the sole option to avoid injury.' " (quoting *People v. Boston*, 2016 IL App (1st) 133497, ¶ 39)).

¶ 68　　　　Applying *Kite* and *Brown*, we conclude that defendant was required to show the existence of a specific and immediate threat for a necessity defense to be warranted. Defendant, however, failed to do so. Defendant argued there was a threat to the public if the firearm was not moved under the passenger seat in the Nissan, because it was in plain view in a crowded area and someone could have stolen it. This vague assertion, which alleged only the possibility that an unidentified individual might attempt to steal the firearm, fails to support a finding of a specific and immediate threat. See *Kite* 153 Ill. 2d at 47 (noting that "vague, uncorroborated testimony" failed to establish a specific and immediate threat). Having failed to meet this threshold requirement, a necessity defense was not warranted.

¶ 69　　　　However, even if defendant had established the existence of a specific and immediate threat, his argument would still fail, as defendant had other options available to him, such as contacting the police. In an effort to argue against that conclusion, defendant relies on *People v. Gullens*, 2017 IL App (3d) 160668, but that case is distinguishable. In *Gullens*, the

defendant was on conditional discharge for a prior theft conviction, which prohibited him from possessing a firearm. *Gullens*, 2017 IL App (3d) 160668, ¶ 3. The State filed a petition to revoke the defendant's conditional discharge after learning that the defendant had possessed a stolen firearm while returning it to the retailer. *Gullens*, 2017 IL App (3d) 160668, ¶ 3. At the hearing on the petition to revoke, evidence was adduced that, *inter alia*, the defendant accompanied a group to a firearm retailer where someone in the group stole a gun without the defendant's knowledge. *Gullens*, 2017 IL App (3d) 160668, ¶¶ 5-6. When the defendant learned this, he took the firearm— possessing it for about 10 minutes—and returned it to the store, informing the clerk that "his younger brother had stolen the gun." *Gullens*, 2017 IL App (3d) 160668, ¶¶ 1, 5-6, 11. A detective who investigated the theft of the firearm agreed on cross-examination that (1) prior to the defendant's possession of the firearm, the defendant could not have been sure that, if he contacted the police, the person who stole the firearm would still be present by the time the police arrived, (2) the defendant faced potential violence if he contacted the police, and (3) it was better that the firearm was returned to the store than being "out on the street." *Gullens*, 2017 IL App (3d) 160668, ¶ 7. The defendant argued the evidence supported a necessity defense because he took the gun to return it to the store and keep it out of the public. *Gullens*, 2017 IL App (3d) 160668, ¶ 9. The trial court determined that the necessity defense did not apply and resentenced the defendant to three years' imprisonment. *Gullens*, 2017 IL App (3d) 160668, ¶¶ 15-16.

¶ 70     The appellate court reversed the revocation of the defendant's conditional discharge, concluding that, because a stolen firearm was "out on the street," there was a specific and immediate threat to public safety. *Gullens*, 2017 IL App (3d) 160668, ¶ 25. The court also concluded that the defendant had no option other than to possess the gun and return it to the store, because the evidence showed there was no guarantee that police would be able to return the firearm

if called, and the defendant reasonably believed that the individual who possessed the firearm at the time would not return it, as he had stolen it. *Gullens*, 2017 IL App (3d) 160668, ¶ 24.

¶ 71　　　　Unlike *Gullens*, there is no indication here that the police, had they been informed of the firearm, would have been unable to secure it before some greater harm came to the public. The evidence showed that the firearm was inside the Nissan with defendant, albeit in plain view. There was no evidence suggesting it was likely that another individual would abscond with this firearm while defendant was still in the car. Instead of calling the police and waiting for officers to arrive, defendant merely pushed the firearm underneath the passenger seat, which left it accessible to either defendant or Johnson later. Thus, defendant's action did not alleviate the threat of the defaced firearm being "on the streets." This is unlike *Gullens*, where the defendant possessed the stolen firearm only to return it to its lawful possessor. Moreover, the evidence showed that when police officers encountered defendant, he did not immediately inform them about the presence of the firearm or that it belonged to Johnson.

¶ 72　　　　Accordingly, even if the firearm being in plain view inside the Nissan posed a specific and immediate threat, defendant had other options that did not require him to push the firearm underneath the passenger seat. Thus, a necessity defense would still be unwarranted. As a result, defendant is entitled to no relief on this issue.

¶ 73　　　　D. Whether Defendant's Conviction for UUWF Violates the Second Amendment

¶ 74　　　　Finally, defendant argues his conviction for UUWF violates the second amendment on its face as a result of the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

¶ 75　　　　The second amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S.

Const., amend. II. "[T]he Second and Fourteenth Amendments [(U.S. Const., amends. II, XIV)] protect the right of an ordinary, law-abiding citizen to possess a handgun" both inside and outside one's home "for self-defense." *Bruen*, 597 U.S. at 8-9; see *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (holding that the second amendment confers an individual right to keep and bear arms); see also *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (holding that the fourteenth amendment incorporates the second amendment such that the second amendment applies to the states).

¶ 76    The Supreme Court recently announced a test in *Bruen* to be applied when assessing the constitutionality of laws meant to regulate conduct protected by the second amendment. The Court first provided that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. To regulate such protected conduct, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As such, "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Bruen*, 597 U.S. at 17 (quoting *Konigsbery v. State Bar of California*, 366 U.S. 36, 50, n.10 (1961)). Pursuant to this test, the *Bruen* Court struck down a New York firearm licensing regime that required individuals to show a "special need for self-defense" to carry a firearm in public, holding that the regime violated citizens' rights to bear arms. *Bruen*, 597 U.S. at 71. In reaching that determination, the Court analyzed the country's history of regulating the public carrying of weapons and concluded that New York's firearm licensing regime was not supported by "an American tradition justifying" it. *Bruen*, 597 U.S. at 11, 70.

¶ 77　　　　　　Defendant argues that section 24-1.1(a) of the Code violates the second amendment on its face pursuant to *Bruen*. 720 ILCS 5/24-1.1(a) (West 2020). Section 24-1.1(a) provides, in part:

> "It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2020).

Defendant first asserts his possession of the firearm was presumptively protected by the second amendment because the right to keep and bear arms is an individual right that belongs to all Americans. Defendant continues that the State cannot show the practice of permanently disarming individuals based upon their status as felons is consistent with the United States's historical tradition of firearm regulation. Thus, defendant contends, pursuant to the framework outlined in *Bruen*, section 24-1.1(a) violates the second amendment. The State responds that defendant's conduct was not constitutionally protected because he is a felon and the second amendment protects only law-abiding citizens' possession of firearms.

¶ 78　　　　　　We find *People v. Baker*, 2023 IL App (1st) 220328, instructive. In *Baker*, the defendant argued that section 24-1.1(a) violated the second amendment as applied to him under the framework announced in *Bruen*. *Baker*, 2023 IL App (1st) 220328, ¶¶ 33, 37. The appellate court determined the defendant could not challenge section 24-1.1(a) as a violation of the second amendment, because, as a felon, "*Bruen* just does not apply to him." *Baker*, 2023 IL App (1st) 220328, ¶ 37. According to the court, *Bruen* "could not have been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding

citizens,' and not felons like defendant." *Baker*, 2023 IL App (1st) 220328, ¶ 37 (quoting *Bruen*, 597 U.S. at 71). The court emphasized that the phrase "law-abiding" was used extensively throughout the majority opinion in *Bruen*. *Baker*, 2023 IL App (1st) 220328, ¶ 37. Further, Justice Kavanaugh's concurrence in *Bruen*, which was joined by Chief Justice Roberts, provided, " '[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons ***.' " *Baker*, 2023 IL App (1st) 220328, ¶ 37 (quoting *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.)). The court explained that, because *Bruen* limited the application of its test to laws seeking to regulate the possession of firearms by " 'law-abiding citizens,' " the defendant was "simply outside the box drawn by *Bruen*." *Baker*, 2023 IL App (1st) 220328, ¶ 37.

¶ 79 Defendant responds that whether felons are encompassed by the second amendment "is not settled," and "the decision in *Baker* is not binding" on this court. We reject the notion that the law is unsettled. We note, initially, that in *Heller*, the Supreme Court held the second amendment conferred an individual right to keep and bear arms and "elevate[d] above all other interests the right of *law-abiding*, responsible citizens to use arms in defense of hearth and home." (Emphasis added.) *Heller*, 554 U.S. at 595, 635. The Court made clear, however, that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626. Thereafter, in *McDonald*, the Court held that the second amendment was "fully applicable to the States" (*McDonald*, 561 U.S. at 750), and Justice Alito "repeat[ed] those assurances" that prohibitions on possession of firearms by felons were not to be questioned. *McDonald*, 561 U.S. at 786 (opinion of Alito, J., joined by Roberts, C.J., and Scalia and Kennedy, JJ.). *Bruen* did not contradict the Court's determinations that the second amendment protects the rights only of law-abiding citizens to bear arms and that states may

prohibit felons from being in possession of firearms. Accordingly, *Baker* comports with second amendment jurisprudence, and we decline to disregard it.

¶ 80　　　　In fact, this court reached the same conclusion as *Baker* in *People v. Boyce*, 2023 IL App (4th) 221113-U, ¶ 16, an unpublished order. In *Boyce*, the defendant was a felon who argued that section 24-1.1 of the Code was unconstitutional on its face pursuant to *Bruen*. *Boyce*, 2023 IL App (4th) 221113-U, ¶ 11. We relied on *Baker* and similarly concluded that use of the phrase "law-abiding" throughout *Heller* and *Bruen* confirmed the second amendment does not encompass felons. *Boyce*, 2023 IL App (4th) 221113-U, ¶ 15 ("However, the Court's language in *Bruen* supports the validity of its dictum in *Heller*."). As a result, we concluded "the *Bruen* decision does not apply to felons" and held that the defendant "failed to show section 24-1.1 is unconstitutional on its face under that decision." *Boyce*, 2023 IL App (4th) 221113-U, ¶ 16.

¶ 81　　　　Accordingly, we hold that *Bruen* does not apply to defendant, as the second and fourteenth amendments protect the right of "law-abiding citizens" to possess handguns. *Bruen*, 597 U.S. at 9-10. Thus, *Bruen*'s historical-tradition test applies to regulations affecting *law-abiding* citizens' possession of firearms. See *Bruen*, 597 U.S. at 71 (holding that New York's proper-cause requirement was unconstitutional where it prevented "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"); *Baker*, 2023 IL App (1st) 220328, ¶ 37 (concluding that *Bruen* applies only to law-abiding citizens); *Boyce*, 2023 IL App (4th) 221113-U, ¶ 16 (same). Because defendant is a felon, he is, by definition, not a law-abiding citizen. Therefore, defendant cannot establish that the second amendment protected his conduct of possessing a firearm, and thus, he does not fall within the scope of *Bruen*. As a result, defendant cannot show that section 24-1.1(a) of the Code violates the second amendment

on its face under the *Bruen* framework. See *Boyce*, 2023 IL App (4th) 221113-U, ¶ 16 (rejecting facial challenge).

¶ 82                                III. CONCLUSION

¶ 83           For the reasons stated, we vacate defendant's conviction for possession of a defaced firearm and remand for a new trial on that charge, and we affirm on all other grounds.

¶ 84           Affirmed in part and vacated in part; cause remanded.